UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

CHONG VANG,                                    CIVIL NO. 11-3351 (PJS/JSM)

    Plaintiff,

v.                                             REPORT AND RECOMMENDATION

MICHAEL J. ASTRUE,
Commissioner of Social Security,

    Defendant.

JANIE S. MAYERON, United States Magistrate Judge.

The above matter is before the undersigned United States Magistrate Judge on plaintiff's Motion for Summary Judgment [Docket No. 9] and defendant's Motion for Summary Judgment [Docket No. 12]. This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation by the District Court pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72.1(c).

For the reasons discussed below, it is recommended that plaintiff's Motion for Summary Judgment be **DENIED** and that defendant's Motion for Summary Judgment be **GRANTED**.

I.      **PROCEDURAL BACKGROUND**

On May 23, 2007, plaintiff Chong Vang ("Vang") filed applications for disability insurance benefits and supplemental security income, alleging disability since November 18, 2005, due to her shoulder, arm, neck, back and depression. Tr. 107-18, 137. Vang's applications were denied initially and upon reconsideration. Tr. 53-62, 68-73. At Vang's request, an administrative hearing was held on January 15, 2010, before Administrative Law Judge Roger Thomas. Tr. 10-19, 20. Vang was represented by an attorney during the hearing. Tr. 20. Testimony was taken at the hearing from Vang, a

medical expert Dr. Andrew Steiner, M.D. ("ME") and vocational expert L. David Russell ("VE"). Tr. 20. The ALJ issued a decision on August 24, 2010, finding that Vang was not disabled under sections 216(i) and 223(d) of the Social Security Act. Tr. 10-19. Vang filed a request for review of the ALJ's decision with the Appeals Council, the Appeals Council denied Vang's request for review and upheld the ALJ's decision denying disability insurance benefits to Vang (Tr. 1-4), making the ALJ's findings the final decision of defendant. See 42 U.S.C. § 405(g).

Vang has sought review of the ALJ's decision by filing a Complaint with this Court pursuant to 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3). [Docket No. 1]. The parties now appear before the Court on plaintiff's Motion for Summary Judgment [Docket No. 9] and defendant's Motion for Summary Judgment [Docket No. 12].

## II. PROCESS FOR REVIEW

Congress has prescribed the standards by which Social Security disability benefits may be awarded. "The Social Security program provides benefits to people who are aged, blind, or who suffer from a physical or mental disability." Locher v. Sullivan, 968 F.2d 725, 727 (8th Cir. 1992); 42 U.S.C. § 1382(a). The Social Security Administration shall find a person disabled if the claimant "is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment." 42 U.S.C. § 1382c(a)(3)(A). The claimant's impairments must be "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 1382c(a)(3)(B). The impairment must last for a continuous period of at least

twelve months or be expected to result in death. 42 U.S.C. § 1382c(a)(3)(A); see also 20 C.F.R. §§ 404.1509, 416.909.

## A.    Administrative Law Judge Hearing's Five-Step Analysis

If a claimant's initial application for benefits is denied, he or she may request reconsideration of the decision. 20 C.F.R. §§ 404.907-09, 416.1407-09. A claimant who is dissatisfied with the reconsidered decision may obtain administrative review by an ALJ. 42 U.S.C. §§ 405(b)(1), 1383(c)(1); 20 C.F.R. §§ 404.929, 416.1429. To determine the existence and extent of a claimant's disability, the ALJ must follow a five-step sequential analysis, requiring the ALJ to make a series of factual findings regarding the claimant's work history, impairment, residual functional capacity, past work, age, education and work experience. See 20 C.F.R. §§ 404.1520, 416.920; see also Locher, 968 F.2d at 727. The Eighth Circuit described this five-step process as follows:

> The Commissioner of Social Security must evaluate: (1) whether the claimant is presently engaged in a substantial gainful activity; (2) whether the claimant has a severe impairment that significantly limits the claimant's physical or mental ability to perform basic work activities; (3) whether the claimant has an impairment that meets or equals a presumptively disabling impairment listed in the regulations; (4) whether the claimant has the residual functional capacity to perform his or her past relevant work; and (5) if the claimant cannot perform the past work, the burden shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.

Dixon v. Barnhart, 353 F.3d 602, 605 (8th Cir. 2003).

## B.    Appeals Council Review

If the claimant is dissatisfied with the ALJ's decision, he or she may request review by the Appeals Council, though review is not automatic. 20 C.F.R. §§ 404.967-404.982, 416.1467-1482. The decision of the Appeals Council (or of the ALJ, if the

request for review is denied) is final and binding upon the claimant unless the matter is appealed to Federal District Court within sixty days after notice of the Appeals Council's action. 42 U.S.C. §§ 405(g), 1383(c)(3); 20 C.F.R. §§ 404.981, 416.1481.

**C.    Judicial Review**

Judicial review of the administrative decision generally proceeds by considering the decision of the ALJ at each of the five steps. The Court is required to review the administrative record as a whole and to consider:

1.    The credibility findings made by the ALJ.

2.    The plaintiff's vocational factors.

3.    The medical evidence from treating and consulting physicians.

4.    The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments.

5.    Any corroboration by third parties of plaintiff's impairments.

6.    The testimony of vocational experts, when required, which is based upon a proper hypothetical question which sets forth plaintiff's impairment.

Cruse v. Bowen, 867 F.2d 1183, 1185 (8th Cir. 1989) (citing Brand v. Secretary of HEW, 623 F.2d 523, 527 (8th Cir. 1980)).

The review by this Court is limited to a determination of whether the decision of the ALJ is supported by substantial evidence in the record as a whole. 42 U.S.C. § 405(g); Bradley v. Astrue, 528 F.2d 1113, 1115 (8th Cir. 2008); Johnson v. Apfel, 210 F.30 870, 874 (8th Cir. 2000); Clark v. Chater, 75 F.3d 414, 416 (8th Cir. 1996). "We may reverse and remand findings of the Commissioner only when such findings are not supported by substantial evidence on the record as a whole." Buckner v. Apfel, 213 F.3d 1006, 1012 (8th Cir. 2000) (citation omitted).

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)); see also Culbertson v. Shalala, 30 F.3d 934, 939 (8th Cir. 1994). "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Buckner, 213 F.3d at 1012 (quoting Prosch v. Apfel, 201 F.3d 1010, 1012 (8th Cir. 2000)); see also Slusser v. Astrue, 557 F.3d 923, 925 (8th Cir. 2009) (citing Gonzales v. Barnhart, 465 F.3d 890, 894 (8th Cir. 2006)) (same); Cox v. Apfel, 160 F.3d 1203, 1206-07 (8th Cir. 1998) (same).

In reviewing the record for substantial evidence, the Court may not substitute its own judgment or findings of fact for that of the ALJ. Hilkemeyer v. Barnhart, 380 F.3d 441, 445 (8th Cir. 2004); Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993). The possibility that the Court could draw two inconsistent conclusions from the same record does not prevent a particular finding from being supported by substantial evidence. Culbertson, 30 F.3d at 939. The Court should not reverse the Commissioner's finding merely because evidence may exist to support the opposite conclusion. Buckner, 213 F.3d at 1011; Mitchell v. Shalala, 25 F.3d 712, 714 (8th Cir. 1994); see also Woolf, 3 F.3d at 1213 (the ALJ's determination must be affirmed, even if substantial evidence would support the opposite finding). Instead, the Court must consider "the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." Gavin v. Apfel, 811 F.2d 1195, 1199 (8th Cir. 1987); see also Heino v. Astrue, 578 F.3d 873, 878 (8th Cir. 2009) (quoting Jackson v. Bowen, 873 F.2d 1111, 1113 (8th Cir. 1989)) (same).

The claimant bears the burden of proving his or her entitlement to disability insurance benefits under the Social Security Act. See 20 C.F.R. §§ 404.1512(a), 416.912(a); Thomas v. Sullivan, 928 F.2d 255, 260 (8th Cir. 1991). Once the claimant has demonstrated he or she cannot perform prior work due to a disability, the burden of proof then shifts to the Commissioner to show that the claimant can engage in some other substantial, gainful activity. See Goff v. Barnhart, 421 F.3d 785, 790 (8th Cir. 2005); Eichelberger v. Barnhart, 390 F.3d 584, 591 (8th Cir. 2004); Martonik v. Heckler, 773 F.2d 236, 239 (8th Cir. 1985).

## III. DECISION UNDER REVIEW

### A. The ALJ's Findings of Fact

The ALJ concluded that Vang was not entitled to disability insurance benefits under sections 216(i) and 223(d) of the Social Security Act, or supplemental security income under section 1614(a)(3)(A) of the Social Security Act. Tr. 19. The ALJ made the following findings:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2010.

2. The claimant has not engaged in substantial gainful activity since November 18, 2005, the alleged onset date (20 CFR 404.1571 et seq., and 416.971 et seq.).

3. The claimant has the following severe impairments: a right shoulder and arm disorder with related pain, rotator cuff tendinitis, obesity, asthma, and a major depressive disorder (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. The claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) with these additional restrictions: she is limited to simple, unskilled, visually demonstrated

tasks; she cannot meet the demands of rapid-paced or high production goals; she can tolerate no contact with the public; she can tolerate no more than brief and superficial contact with co-workers and supervisors; she can perform no right overhead work; she can perform no power gripping with her left upper extremity; she cannot tolerate exposure to high concentrations of air pollutants.

6. The claimant is capable of performing past relevant work as a assembly worker. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965).

7. The claimant has not been under a disability, as defined in the Social Security Act, from November 18, 2005 through the date of this decision (20 CFR 404.1520(1) and 416.920(1)).

Tr. 12-18.

## B.    The ALJ's Application of the Five-Step Process

The ALJ made the following determinations under the five-step procedure.  At step one, the ALJ found that Vang had not engaged in substantial gainful activity since November 18, 2005.  Tr. 12.  At the second step, the ALJ found that Vang had severe impairments of a right shoulder and arm disorder with related pain, rotator cuff tendinitis, obesity, asthma, and a major depressive disorder.  Id.

At the third step of the evaluation, the ALJ determined that Vang did not have impairment or combination of impairments that met or equaled the relevant criteria of any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  Tr. 13. Specifically, the ALJ found that neither Vang's physical nor mental impairments met or equaled any of the listings.  Id.  The ALJ relied and placed significant weight on the opinion of clinical psychologist Dr. Karen Butler, Ph.D., to make this finding as to Vang's mental impairments.  Id.

In determining that Vang's mental impairment did not meet or medically equal the criteria of Listing 12.04 for affective disorders, pursuant to "paragraph B" of Listing

7

12.04, the ALJ considered whether Vang's impairments resulted in at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence or pace; or repeated episodes of decompensation, each of extended duration.  Tr. 13-14.

With regard to activities of daily living, the ALJ relied on Dr. Butler's conclusion that Vang had no more than a moderate limitation in this area.  Tr. 14.  The ALJ also relied on Vang's statements made during an consulting examination by psychologist Dr. Mark Schuler, Ph.D. in March 2007, that her day began at 6 a.m. when she helped her children prepare for school, she cooked for the family, and she swept, vacuumed, went grocery shopping two to three times a week, drove and visited with family and friends. Id. (citing Tr. 283).

Based on the opinion of Dr. Butler, the ALJ found moderate difficulties in social functioning.  Tr. 14.  The ALJ also premised this determination on the fact that the record showed that Vang got along well with her children, examining psychologist Dr. Robert Barron, Ph.D., found her responses to be logical and goal directed, and she was able to shop on a regular basis, all of which suggested that she was able to go out in the public and tolerate at least superficial interactions with others.  Id. (citing Tr. 329).

With respect to her ability to maintain concentration, persistence or pace, again based on Dr. Butler's opinion, the ALJ found that Vang had a moderate limitation in this area.  Tr. 14.  The ALJ acknowledged that Vang stated to Dr. Schuler that she had memory problems, (Tr. 14 (citing Tr. 287)), but noted that during her mental status examination by Dr. Schuler, Vang displayed no difficulty in performing a simple focused attention tasks.  Tr. 14 (citing Tr. 285).  As for any evidence of decompensation, stating that the record reflected no extended psychiatric hospitalizations and no evidence that

Vang was required to leave a work-like setting due to psychologically-based symptoms or an inability to leave home, the ALJ determined that Vang suffered no episodes of decompensation. Tr. 14. Thus, he concluded that Vang did not satisfy the "B criteria" of Listings 12.04. Id.

The ALJ also found, based on the opinion of Dr. Butler, no evidence of the "C criteria"[1] of the Listings. Tr. 14-15.

In support of his determination of Vang's residual functional capacity ("RFC") at the fourth step of the evaluation process, the ALJ gave considerable weight to the testimony of independent medical expert, Dr. Steiner, that Vang was limited to a light level RFC as to her physical limitations. Tr. 15. As for Vang's mental impairments, based on Dr. Butler's considerable experience assessing work-related limitations for individuals and strong understanding of the medical record, the ALJ placed significant weight on her opinion that Vang could perform simple, unskilled work that is visually

---

[1]     To satisfy the C criteria of Listing 12.04, the claimant must show:

    a medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:

    1. Repeated episodes of decompensation, each of extended duration; or

    2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or

    3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(C).

demonstrated, could not work at a rapid pace or meet high production goals, and should have no public contact and only brief and superficial with co-workers. Id. The ALJ also gave significant weight to the opinions of the state agency physicians, Dr. James M. Alsdurf, Ph.D. and Dr. R. Owen Nelsen, Ph.D., that Vang was able to concentrate on, understand, remember and carry out routine, repetitive, three-to-four-step tasks and instructions, and she was able to tolerate brief and superficial contact with co-workers and the public, as they were consistent with each other and the record as a whole. Id. (citing Tr. 339-64, 467-72).

Additionally, the ALJ placed significant weight on examining psychologist Dr. Barron's opinion that Vang was capable of communicating, comprehending, and retaining simple directions in an entry-level employment situation. As for Dr. Barron's statement that "it would appear doubtful that she would be capable of withstanding work-related stresses, performing routine and repetitive activities with reasonable persistence and pace, or meeting production requirements in an entry-level employment situation," the ALJ did not interpret this statement to mean that Vang was unable to tolerate stress, meet production requirements or perform with reasonable pace. Tr. 16 (citing Tr. 331). The ALJ noted that Dr. Barron's opinion was based in part on the report of Dr. Schuler, a report which Dr. Barron had discredited. Tr. 16.

The ALJ found that the record did not support the March 2007 opinion by Dr. Schuler that Vang would experience problems maintaining a competitive rate of work while performing tasks that require any type of visual scanning or processing, and that her depression would interfere with a consistent rate of work performance. Id. In making this finding, the ALJ stated that Dr. Barron had found that Dr. Schuler's report was probably an underestimate of her cognitive abilities. Id. (citing Tr. 326-32).

Further, the ALJ relied on Vang's activity level and her ability to be responsible for young children to show that she was functioning at a higher level than that described by Dr. Schuler. Id.

The ALJ gave limited weight to the opinions set forth in a mental impairment questionnaire prepared by Vang's treating psychotherapists, Dr. Jonathan Hoistad, Ph.D., and Xullvong Moua, M.A., on December 3, 2009, in which they opined that Vang could tolerate no stress; would miss more than three days of work per month; had a poor or no ability to maintain attention for two-hour segments; poor or no ability to complete a normal work day or work week without interruptions from psychologically-based symptoms; poor or no ability to accept instructions and respond appropriately to supervisors; marked restriction of activities of daily living; and marked difficulties in maintaining concentration, persistence , or pace. Tr. 16-17 (citing Tr. 639-44). The ALJ also indicated that certified nurse practitioner Carol Thersleff, who was Vang's therapist from June 15, 2009 through at least November 23, 2009, filled out the same form and set forth similar limitations. Tr. 17. The ALJ found the record did not support the extreme limitations given by Dr. Hoistad, Moua and Thersleff based on Vang's ability to raise her young children and perform housework during the long period of time she was estranged from her husband and the only adult in the household. Tr. 17. The ALJ also noted that while Dr. Hoistad and Moua stated Vang's level of functioning was poor in the mental impairment questionnaire, in their medical reports they stated her level of functioning was fair on some occasions, and on other occasions indicated it was poor. Tr. 16-17 (citing Tr. 384-437, 623-44).

As for her subjective complaints, the ALJ noted that Vang's medications were consistent for her established impairments and the record did not suggest that she

failed to receive significant relief of symptoms with the use of medication. Tr. 17. The ALJ also noted that Vang was inconsistent her use of medication in that she alternated the medication that she was supposed to be taking on a daily basis, (id. (citing Tr. 329-30)), and she understood that some of her problems could be reduced by taking her medication and she did have some control over her problems. Id. (citing Tr. 442).

The ALJ found that Vang made contradictory statements as to what she could do on a daily basis, observing that in March 2007, she told Dr. Schuler that she prepared all of the family's meals, could perform household chores and visited friends weekly, but in August 2007, she stated to Dr. Barron that her husband prepared the meals, she did no household chores, and had no friends. Tr. 17 (citing 283, 328, 330).

In further development of the RFC, the ALJ considered Vang's work history which showed that she stopped working in November 2005, the date that coincides with the date she alleges she first became disabled. Tr. 17. However, she told Dr. Schuler that she stopped working, not because of her disability, but because the third shift that she worked was discontinued and she did not return to work because she could not find childcare. Id. (citing Tr. 281). The ALJ also noted that Vang is a fulltime parent and as of March 2007, two of her children were not yet school aged and she babysat them on a daily basis. Tr. 18.

The ALJ considered but did not place much weight on the written statements from Vang's daughter and husband, given their relationship to Vang and their incentive to support her. Id. According the ALJ, Vang's husband basically described Vang as an invalid, yet for an extended period of time, she was solely responsible for all of the activities he claimed he performed alone. Id. In addition, the ALJ observed that the

husband and daughter's statements about who did the cooking contradicted each other. Id.

Based on the RFC assigned to Vang and the VE's testimony, the ALJ concluded that Vang was able to perform her past relevant work as an assembly worker. Id.

## IV.     THE RECORD

### A.     Background

Vang was 42-years-old when she filed her application for benefits in May 2007. She had nine children, five of which still lived at home (ranging from three to seventeen years old) at the time of the hearing before the ALJ. Tr. 27.

### B.     Functional Reports by Vang, Husband and Daughter

On June 13, 2007, Vang and her husband both filled out reports on Vang's abilities to function. Tr. 149-156, 160-67. Vang's husband indicated that he took care of Vang and the children, cooked, cleaned and did the shopping. Tr. 150. While Vang used to be able to do this work, she could no longer do so. Id. The children assisted Vang by giving her clothes to wear, giving her a bath, and helping her care for her nails. Id. Vang needed to be reminded to groom herself, to take her medications, and to go to medical appointments. Tr. 151, 153. Vang could not cook because she could not concentrate. Id. Vang travelled by riding in a car and using a medical rider, and she was afraid to go anywhere by herself because she felt she might get lost. Tr. 152. Vang shopped once a month for 30-40 minutes with her husband. Id. Vang's husband stated that he paid the bills. Id. Vang could no longer attend family ceremonies; she was forgetful and could not finish tasks; she could only pay attention for less than 5 minutes at a time; she could not follow spoken instructions very well; she handled stress by being alone; and her condition worsened with changes in her routine. Tr. 154-55.

In her report, Vang indicated that she spent her day by waking up at 7:00 a.m.; she went to the couch to ruminate about things; she ate breakfast at 9:00 a.m., which was cooked by her husband; in the summer she went outside for 5-10 minutes; she ate dinner at 7:00 p.m.; and went to bed at 10:00 p.m. but did not fall asleep until 2:00 or 3:00 a.m. Tr. 160. Vang stated that her husband took care of her and the children. Tr. 161. Her children assisted her by giving her clothes to wear, giving her a bath, and helping her care for her nails. Id. Her family reminded her to take care of her personal needs and grooming; they took care of cooking since she forgets easily; she went to medical appointments using a medical rider; she went shopping once a month with her husband for clothing; and her husband took care of the bills. Tr. 162-63. Vang noted that she spent time with her family, went to the Hmong New Year celebration for 1 hour, went to her doctor's appointment 2-3 times per week, no longer visited her relatives, and complained of a poor memory and concentration. Tr. 164-65. Vang claimed that she could only concentrate for about 5 minutes at a time, dealt with stress by being calm and alone, and changes in her routine caused her greater depression. Tr. 165-66.

Vang's daughter submitted a functional report dated February 15, 2008. Tr. 182. The report contains virtually the same statements of Vang's functional abilities as that set forth in her father and mother's reports, except that the daughter represented that she, as opposed to her farther, did the cooking and cleaning, took care of her younger siblings, took her mother shopping, and paid the bills. Tr. 182-89.

C.    **Medical Records**[2]

    1.    **Treatment Records**

        a.    Treatment by Dr. Jonathan Hoistad and Xulivong Moua from 2006 through 2009

In March 2006, Vang presented to licensed psychologist, Dr. Jonathan Hoistad, complaining of being worried about family finances, shoulder problems, not being able to sleep at night, poor appetite and depression for the last five years. Tr. 434. Vang's husband had moved out in 2003. Id. Vang was physically abused by her husband. Tr. 435. She was not able to engage in any social activities because she did not have the time. Tr. 436.

Dr. Hoistad's impression of Vang was that she was very depressed over her finances and taking care of her children. Id. Dr. Hoistad felt that Vang's prognosis was fair. Tr. 436. Regarding her mental status, he observed that she appeared casual, her mood was depressed, her affect was appropriate and her thought process was normal. Id. Dr. Hoistad diagnosed Vang with major depressive disorder, recurrent, moderate, and assigned her with a GAF of 45.[3] Id. The treatment plan was to meet weekly with a

---

[2]    As Vang is only challenging the determination by the ALJ regarding her mental impairment, and did not refer to any facts regarding her physical ailments or symptoms, this Court has not included in its description of the medical records various reports from medical providers regarding other illnesses and issues for which she sought treatment. Any claim regarding her physical impairments are waived. See Craig v. Apfel, 212 F.3d 433, 437 (8th Cir. 2000); see also Yeazel v. Apfel, 148 F.3d 910, 911-12 (8th Cir.1998) (citing Roth v. G.D. Searle & Co., 27 F.3d 1303, 1307 (8th Cir. 1994) (finding failure to raise an issue before this Court results in waiver of that argument)).

[3]    According to the DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 34 (4th ed. Text Revision 2000) ("DSM-IV"), GAF scores of 41 to 50 reflect "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."

therapist, practice coping skills, and coordinate as it relates to social security supplemental income. Tr. 437.

From March 14, 2006 through March 2008, Vang met with Dr. Hoistad and therapist Xulivong Moua, M.A., who worked with Dr. Hoistad, for psychotherapy sessions. The results of each session were set forth in progress notes signed both by Dr. Hoistad and Moua.[4] Tr. 387-433, 487-509. Each progress note was made up of sections entitled: Current Issues/Complaints; Medications; Mental Status; Review of Symptoms; Objective; Assessment/Diagnosis, Level of Functioning; Progress Toward Treatment Goals; and Plan. Id. The section entitled "Mental Status" listed various dimensions including mood, affect, attention/concentration, thought processes, associations, memory and insight/judgment, and required the therapist to write in his or observations on that particular dimension. Id. The "Review of symptoms" section listed 36 different types of symptoms (e.g., sad/depressed, sleep disturbance, anxiety/worry, inability to focus, concentration, etc.); as for any symptom the therapist believed applied, he or she would place a checkmark next to that symptom. Id. The section entitled "Level of Functioning" had boxes labeled poor, fair, average, good or excellent, and required the provider to check the applicable box. Id. The "Progress Toward Treatment Goals" section asked the therapist to check the applicable box indicating no progress, some improvement or great improvement. Id.

From March 2006 through May 2007, issues and complaints identified by Vang included her husband rejoining the family in February 2006, but not working; struggling with finances and public assistance; arm pain; the health and well-being of her children; her pregnancy and upcoming birth of her child; her husband not participating with the

---

[4]     For the purpose of this decision, the Court refers to Dr. Hoistad in describing the contents of these notes as it appears that he was the individual who filled them out.

family; being denied social security supplemental income; having to take care of the family and feeling like she was "wearing the pants in the home;" not being able to work because of the pain in her right arm; not being able to divorce her husband due to cultural issues; and being forgetful. Tr. 387-433. The stated objectives of these sessions during this time period were mental health support and to assist her to obtain financial support. See, e.g., Tr. 418, 420, 422, 427, 428, 430, 431. Dr. Hoistad opined during this time period that Vang's level of functioning was poor and she showed no progress. Id. Vang was diagnosed with major depressive disorder, recurrent, moderate; and a pain disorder associated with both psychological factors and a medical condition. Tr. 387-433.

Starting in June 27, 2007, Dr. Hoistad reported that Vang was showing some improvement. Tr. 399. Vang told Dr. Hoistad that she wanted to go back to her work, but that her back pain was keeping her from doing so. Id. In August 2007, Dr. Hoistad noted that Vang's level of functioning improved to fair and some improvement was seen with her depression. Tr. 395. On September 6, 2007, Vang reported to Dr. Hoistad that her depression was getting worse, despite Dr. Hoistad's belief that Vang showed some improvement. Tr. 394. On December 5, 2007, Vang's level of functioning was rated by Dr. Hoistad as fair, with some improvement with her depression. Tr. 392. Vang was stressed out with public assistance rules and regulations, as they wanted her to find work or go to school, and Vang felt that was very difficult for her to do given that she had two small children and her husband had run off. Id. On January 15, 2008, Vang reported to Dr. Hoistad that her husband had run off with another woman and that he had not come back for a few weeks. Tr. 389. Dr. Hoistad noted that Vang's level of functioning was poor, with some improvement. Id. On January 29, 2008, Vang

reported to Dr. Hoistad that she was having a flashback from the burglary of her house. Tr. 388. Vang indicated that she sometimes forgot to cook for her children. Id. Her husband had not been at home for months. Id. Dr. Hoistad opined that Vang's level of functioning was poor, with some improvement. Id.

In February 2008, Vang reported to Dr. Hoistad that she could not sleep and she had communication problems with her children and husband, resulting in a family fight, and she had health and financial problems. Tr. 387. Dr. Hoistad reported that Vang's level of functioning was fair, with some improvement.

From February 2008 to November 2008, Vang reported issues and complaints to Dr. Hoistad, including problems communicating with her children who were being disobedient and having behavioral problems, problems with sleeping and headaches, wanting to help financially by obtaining SSI benefits, her husband's affair, financial stresses, and chronic pain. Tr. 487-509. Dr. Hoistad indicated that Vang's level of functioning during this period was primarily fair and showing some improvement. Id. Vang's diagnosis was major depressive disorder, moderate. Id.

From November 24, 2008 through April 15, 2009, Vang reported to Dr. Hoistad that her children were getting into trouble; she was having problems with her husband (from whom she was separated); she had financial stress (including applying for SSI benefits and housing issues); she had arm pain, sleep problems, and fatigue; and she had been involved in a car accident. Tr. 582-605. Dr. Hoistad opined that Vang's level of function ranged from fair to poor with some improvement. Id. Dr. Hoistad's diagnosis for Vang was a major depressive disorder and the intervention prescribed for Vang was to work on her coping skills, group therapy and medications. Id.

From May 19, 2009 through November 24, 2009, Vang reported to Dr. Hoistad that she had no child support from her husband and financial stress; her children were having problems at school and getting into fights and arguments; she was trying to find a new house to live in; her daughter was having legal problems related to destruction of property; her daughter had run away from home; and she was suffering from mood swings and having feelings of hopelessness and helplessness.  Tr. 576-80, 625-37.  Dr. Hoistad opined that Vang's level of functioning during this time was poor with no progress.  Id.  From October 2009 through November 2009, Dr. Hoistad diagnosed Vang with a major depressive disorder, moderate, severe depression without psychotic features, (Tr. 625-27), anxiety, and a learning disability.  See, e.g., Tr. 625, 628, 633.

Throughout his work with Vang, Dr. Hoistad indicated under the Mental Status section that her mood was depressed; her affect was flat or appropriate; her attention/concentration was limited or poor; her thought processes were fair, limited or poor; and her associations and memory was fair, limited, poor or had no comment at all. Id.  Tr. 387-433, 487-509.  For symptoms, Dr. Hoistad checked one or more of the following: sad/depressed mood, sleep disturbance, loss of interest/enjoyment, hopeless/helplessness/worthless, anxiety/worry, mood swings, memory issues, irritability, excessive worry, fatigue, nightmares, flashbacks, inability to focus and concentration/focus.  Id.

On December 9, 2009, Dr. Hoistad and Moua filled out a mental impairment questionnaire for Vang, indicating they had seen her bi-monthly for a three-year period. Tr. 639-44.  Their DSM-IV diagnosis for Vang was major depressive disorder, moderate, and they stated that Vang's highest GAF score for the year was 46.  Tr. 639.  They identified the following symptoms for Vang: poor memory; sleep disturbance; mood

disturbance; emotional lability; loss of interest; difficulty thinking or concentration; apprehensive expectation; time or place disorientation; flat affect; decreased energy; generalized persistent anxiety and hostility; and irritability. Id. They also noted that Vang had been depressed for over ten years and could sometimes get suicidal. Id. They opined that her fatigue moderately impaired her ability to work and she could handle no stress in an employment setting. Tr. 640.

Dr. Hoistad and Moua stated that the following clinical findings demonstrated the severity of Vang's mental impairments and symptoms: poor ability to focus; poor short-term memory; irritable mood; sleep disturbances; feelings of hopelessness. Id. They indicated Vang's response to treatment was fair, her prognosis was guarded, and her condition was expected to last at least 12 months. Id.

With regard to Vang's mental abilities and aptitude to do good work, Dr. Hoistad and Moua opined that Vang had a good ability to work in coordination with others without being distracted, ask simple questions and ask for assistance, get along with co-workers and be aware of normal hazards and take appropriate precautions; a fair ability to remember work-like procedures, understand, remember and carry out short and simple instructions, maintain regular attendance and sustain an ordinary routine without supervision, make simple work-related decisions, respond appropriately to changes in a routine work setting, and deal with normal work stress;[5] and poor or no ability to maintain attention for two-hour segments, complete a normal workday or week without interruptions from psychologically-based symptoms, perform at a consistent pace

---

[5] "Good ability" was described as the "[a]bility to function in this areas is limited but satisfactory; "fair ability" was defined as the "[a]bility to function in this area is seriously limited, but not precluded;" and "poor or none" was defined as "no useful ability to function in this area on a consistent or regular basis." Tr. 641.

without a unreasonable number of rest periods, and accept instructions and criticism from supervisors. Tr. 641-42. Id. In support of those areas they rated as fair or poor, Dr. Hoistad and Moua explained that Vang was limited in these areas due to poor concentration, inability to focus, and her irritable mood. Tr. 642. They indicated that Vang's condition would cause her to miss work more than three times a month. Tr. 641.

In the area of mental abilities and aptitudes needed to do particular types of jobs, Dr. Hoistad and Moua opined that Vang had a good ability to interact appropriately with the general public, maintain socially appropriate behavior, and adhere to basic standards of neatness; and a fair ability to travel in unfamiliar places and use public transportation. Id. Vang was limited in the areas of travel and use of public transportation due to her poor English and cultural issues. Id.

Dr. Hoistad and Moua checked that Vang had a marked limitation[6] as to restrictions of daily living and in maintaining concentration, persistence or pace, a moderate limitation in the area of maintaining social functioning. Tr. 643. They noted that Vang had repeated episodes of decompensation in the form of sleeping for a few days with low energy, and indicated that Vang's daughter was taking care of the family during these unspecified periods of decompensation. Id. Dr. Hoistad and Moua did not believe that Vang could manage benefits in her own best interest. Tr. 644.

---

[6] "Marked limitation" means "more than moderate, but less than extreme. A marked limitation may arise when several activities or functions are impaired, or even when only one is impaired, so long as the degree of limitation is such as to seriously interfere with the ability to function independently, appropriately, effectively, and on a sustained basis. Tr. 643.

In June 2006, Vang saw psychiatrist Dr. Roger A. Johnson with complaints of depression for three years, insomnia, loss of interest, low appetite, lowered concentration and memory, feelings of helpless, and thoughts of death with no suicidal ideation. Tr. 310. She was given a prescription for the anti-depressant fluoxetine. Id. On June 19, 2006, Vang reported that she was doing a little better, but had complaints of insomnia. Tr. 444. Dr. Johnson diagnosed Vang with major depressive disorder in partial remission. Id. Dr. Johnson gave Vang Depakote ER. Id. On July 17, 2006, Vang reported that the Depakote did not help her, so it was discontinued and Vang was placed on Effexor and Prozac. Id. Vang reported no improvement during her July 20, 2006 through October 16, 2006 appointments, so she was provided with new prescriptions. Tr. 307. On July 20, 2006, she was diagnosed with recurrent major depressive disorder, severe; at her appointments September and October 2006, Vang was diagnosed with mild recurrent major depressive disorder. Tr. 307-08. Vang reported improvement during the November 13, 2006 and December 13, 2006 appointments. Tr. 306. While she reported not being able to sleep at night, it was because she was sleeping during the day. Tr. 305-06. On January 15, 2007, Dr. Johnson diagnosed Vang with major depressive order, recurrent, in partial remission. Tr. 305. On February 15, 2007, Vang reported more depressive symptoms. Tr. 305. On March 20, 2007, Dr. Johnson noted that Vang had improved, and diagnosed Vang with major depressive order, recurrent, in partial remission. Id.

On May 21, 2007, Vang saw Dr. Johnson regarding her partially treated depression. Tr. 304. She was given Effexor XR. Id. On June 19, 2007, Dr. Johnson diagnosed Vang with major depressive order, recurrent, in partial remission. Tr. 444.

On August 16, 2007, Dr. Johnson reported that her medications were effective, but that she was not sleeping at night and was sleepy during the day.  Tr. 441.  Dr. Johnson recommended that Vang get some exercise and "do something."  Id.  Vang was kept on the same medications.  Id.  She was diagnosed with major depressive order, recurrent, in partial remission.  Id.  On December 11, 2007, Dr. Johnson noted that Vang was off her medications and opined that she was suffering a major depressive disorder, recurrent, moderate.  Id.  Dr. Johnson put Vang on Cymbalta.  Id.  On January 10, 2008, Dr. Johnson found that Vang had improved some, but that she still met the DSM-IV for a major depressive disorder, recurrent, mild, and added Lexapro to treat her depression.  Tr. 440.

On February 8, 2008, Dr. Johnson noted that Vang had gotten better with the Lexapro, but then her husband left her alone with the kids and she was suffering from nightmares and anxiety.  Id.  Dr. Johnson prescribed Vang with Doxepin.  Id.  On March 11, 2008, Vang reported worrying excessively of being denied social security benefits.  Tr. 573.  Dr. Johnson placed Vang on Trazodone to help her sleep.  Id.  On April 10, 2008, Dr. Johnson reported that Vang had improved.  Id.  Vang told Dr. Johnson that legal aid was helping her with a social security appeal and the Trazodone had improved her sleep.  Id.  She still reported nightmares and some depressive symptoms.  Id.  Dr. Johnson had Vang try Clomipramine for her depression.  Id.  She was diagnosed with major depressive order, recurrent, in partial remission.  Id.

On May 12, 2008, Dr. Johnson noted that Vang had worsened, she met the DSM-IV criteria for a major depressive disorder, recurrent, mild, and that medications were not probably going to help her with her condition.  Tr. 572.  He also noted that Vang could not work given her current mental condition and that she should appeal the

social security rejection of benefits.  Id.  Dr. Johnson added Seroquel in order to treat Vang's depression.  Id.  On June 9, 2008, Vang was a little improved and was able to sleep seven hours per night.  Id.  Dr. Johnson also found Vang to be generally inept, probably due to a dependent personality disorder.  Id. On July 8, 2008, Dr. Johnson reported that Vang was still suffering from a major depressive order, moderate, and it appeared that her medication regimen was not helping bring her back to normal.  Tr. 571.  Dr. Johnson decided to have Vang try Strattera for her depression.  Id.

On August 8, 2008 Dr. Johnson noted that Vang was still suffering from depression, reoccurring, moderate, and that Trazodone appeared to be the only medication that provided any relief for Vang, so she discontinued all other medications. Tr. 570-71.   On September 4, 2008, Vang met the DSM-IV criteria for a major depressive disorder, recurrent, mild.  Tr. 570.  On October 6, 2008, Vang reported being off all medications, except for Trazodone, and that she had improved some, but was still depressed.  Tr. 570.  Vang appeared to have improved a little.  Id.  On November 6, 2008, Dr. Johnson reported that Vang appeared to be "quite a bit better."  Tr. 569. Vang was animated and talked spontaneously.  Id.  Vang still had stress issues, but showed no side effects to her medications.  Id. She was diagnosed with major depressive order, recurrent, in partial remission.  Id.  On December 9, 2008, Vang reported that the Trazodone was making her nauseous, so she was switched to Seroquel.  Id.  On January 22, 2009, Vang was seen by Dr. Johnson who found her to have improved a little bit more, she reported that she slept fine and had no medication side effects.  Id.  She was diagnosed with major depressive order, recurrent, in partial remission.  Id.

From February 10, 2009 through April 10, 2009, Vang reported to Dr. Johnson that she had stress in her life, which she described as depression, she was not getting any better, and although all of the medications had been tried without effect, Vang did not want to go off of them.  Tr. 568.  Dr. Johnson did not believe that drugs were the answer to treating her depression.  Id.  Vang was diagnosed with major depressive order, recurrent, unspecified during this time.  Id.

> c.  Treatment by Certified Nurse Practitioner Carol Thersleff from June 15, 2009 through November 23, 2009

On June 15, 2009, Thersleff conducted a mental health intake assessment of Vang.  Tr. 655-59.  Vang was dressed casually and her speech was normal.  Tr. 655.  Her thoughts were logical, but she cried easily.  Id.  Vang reported her mood as being depressed and that her depression started in 2003, after her husband had assaulted her and dislocated her shoulder.  Id.  Vang stated that she had problems sleeping and only slept 2-3 hours per night.  Id.  Her appetite varied.  Id.  Vang had a decreased interest in pleasure and decreased energy.  Tr. 656.  Vang denied any psychomotor issues.  Id.  Vang felt hopeless, helpless, worthless and guilty.  Id.  Vang reported that she had a short temper and that she angered easily.  Id.  She complained that she never felt happy and believed that she would only be happy when she died.  Id.  Vang had suicidal ideations, but no history of suicidal attempts.  Tr. 656, 658.  Vang had no delusional behaviors, but she did have anxiety and panic attacks twice a week for 30 minutes, which she said were caused by thinking too much.  Tr. 656-57.  Vang had reoccurring negative thoughts, no obsessive or compulsive conduct, and reported memory problems.  Tr. 657.  Vang was separated from her husband and she lived with five of her children, the youngest of which was two years old.  Tr. 658.

Thersleff believed that Vang was a medium risk and diagnosed her with major depressive affective disorder and severe psychosocial stressors.  Tr. 659.

Vang continued to see Thersleff through November 23, 2009.  Tr. 646-54. Thersleff's diagnosis for Vang during this period was major depressive disorder, recurrent, severe with psychotic features and chronic pain.  Id.  Thersleff noted that Vang's behavior during these consultations was cooperative; her speech was logical, her appearance was mostly tired; she was orientated x3; her mood ranged from neutral to sad; her affect was appropriate; she had adequate insight and judgment; her thought process was logical and preoccupied (due to finances and pain); and she had occasional thoughts of suicide with no plan.  Id.  During this time period, Vang reported that her appetite, activity and energy were low.  Id.  She also had problems sleeping due to pain, but that was getting better.  Tr. 646.  Concerns raised during these sessions included that her daughter had run away, depression, back pain, liver pain, sleeping problems, and financial issues.  See, e.g., Tr. 648, 649, 651.

On December 21, 2009, Thersleff filled out a mental impairment questionnaire for Vang.  Tr. 661-66.  Thersleff's DSM-IV diagnosis for Vang was major depressive disorder, recurrent, severe with psychotic features and with severe psychosocial stressors, chronic pain, and a GAF of 49.  Tr. 661.  In support, Thersleff listed the following symptoms: poor memory; sleep disturbance; mood disturbance; emotional lability; recurrent panic attacks; feelings of guilt and worthlessness; loss of interest; difficulty thinking or concentrating; motor tension; apprehensive expectation; suicidal ideation; decreased energy; intrusive recollections of a traumatic experience; persistent irrational fears; generalized persistent anxiety; somatization; and autonomic hyperactivity.  Tr. 661.  Thersleff also noted that Vang had witnessed her father's death

26

when she was six years old and had been assaulted and abandoned by her husband in 2003. Id.

Thersleff opined that Vang's fatigue moderately impaired her ability to work and she could only handle a low amount of stress in an employment setting. Tr. 662. This opinion was based on the fact that when Vang becomes anxious, she angers easily, panics and cannot think clearly, and Vang's history of intrusive and traumatic memories. Id. Thersleff also noted that when Vang first came to see her, she was on a number of medications, which she had been slowly tapering down. Id.

Thersleff's prognosis was Vang's condition was chronic and was likely to last at least 12 months. Id. Thersleff believed that Vang's condition would cause her to miss work more than three times a month. Tr. 663.

With regard to her mental abilities and aptitude to do unskilled work, Thersleff checked that Vang had a fair ability to remember and understand simple instructions, get along with co-workers, respond adequately to a change in routine, be aware of normal hazards and take appropriate precautions; a fair to poor ability[7] to carry out very short and simple instructions, maintain attention for two-hour segments, work next to others without being unduly distracted, make simple work-related decisions, perform at a consistent pace without taking an unreasonable number of breaks and deal with normal work stress; and a poor ability to remember work-like procedures, maintain regular attendance, sustain an ordinary routine without special supervision, complete a normal work day or week without interruptions caused by her condition, ask for help, and accept instruction or take criticism from supervisors. Tr. 663-64. According to Thersleff, these limitations were due to Vang's mental impairments. Tr. 664.

---

[7] The "fair to poor" category is based on Thersleff checking in between the fair or poor box as to a particular category.

In the area of mental abilities and aptitudes needed to do particular types of jobs, Thersleff checked that Vang had a good ability to adhere to basic standards of neatness; a fair ability to interact appropriately with the general public and maintain socially appropriate behavior; a fair to poor ability to use public transportation; and no ability to travel in unfamiliar places. Tr. 664. Vang was limited in these areas due to being poorly acclimated to this country and her increased stress. Id.

Thersleff checked that Vang had marked limitations as to restrictions of daily living, maintaining social functioning, and maintaining concentration, persistence or pace. Tr. 665. Thersleff noted that her exam of Vang indicated that her depression had worsened in 2003 after her husband assaulted and left her. Tr. 666. Since then, Vang had experienced periods of exacerbation and remission of her depressive symptoms. Id. Thersleff also indicated that Vang had been compliant with her visits and medications. Id. Thersleff believed that Vang could manage benefits in her own best interest. Id.

### 2. Consulting Records

#### a. March 15, 2007 Consultation with Dr. Mark Schuler

On March 15, 2007, Vang was referred to Dr. Schuler by a Social Security advocate with the Hmong American Partnership. Tr. 281. Vang complained to Dr. Schuler that she had a lot of stress and could not do anything. Id. Vang indicated that she was depressed, as her husband had remarried and she was unable to take care of her family. Id. Vang claimed that she had been suffering from depression since 2000 after she and her husband separated, she had never been treated for depression before her husband left, and was taking medication for her condition. Tr. 281-82, 287. Her

husband returned to the family in 2005 but she continued to be depressed because she was never sure as to whether he would stay or leave. Tr. 282, 287

Vang received no formal education in Laos or Thailand. Tr. 281. She told Dr. Schuler that she had worked on an assembly line from July 1997 to November 2005. Id. She had worked the third shift, but when the shift was discontinued, she did not have anyone to provide childcare services and had not worked since then. Id. Vang considered her shoulder pain and headaches to be her biggest barriers to working. Id.

With regard to activities and skills of daily living, Vang told Dr. Schuler that her day begins at 6:00 a.m. when she got up to help her children prepare for school. Tr. 283. If she needed help, she would get assistance from the older children. Id. Vang bathed every day. Id. Vang indicated that she did the cooking for the family, was able to sweep and vacuum, made her bed two-three times a day (usually with help from her children), went grocery shopping three times a week, paid bills with the help of her husband or son, could buy a money order herself to pay the bills if no one was available, and knew how to drive a car. Id. Vang went to bed between 9:00 and 10:00 p.m., but did not fall asleep until midnight or 1:00 a.m. Id.

Regarding her interests, Vang indicated that she was usually at home babysitting her two youngest children. Id. She tried to keep her house clean while she was babysitting, watched some television, took walks outside when the weather was nice, visited her family twice a week, visited her friends once a week, and attended the Hmong New Year celebrations and Hmong funerals. Id.

With regard to her ability to relate, Vang told Dr. Schuler that she did not have any ongoing arguments with anyone. Id. Vang denied any current suicidal ideation, but

stated that she had thoughts about harming herself when her husband initially left the family. Tr. 284, 287. Vang indicated she had sleep problems. Id.

Dr. Schuler observed that Vang's affect was mildly liable and her mood was somewhat depressed. Tr. 284.

Dr. Schuler conducted performance testing on Vang designed to measure her problem-solving, attention abilities, processing speed and motor efficiency, semantic fluency, and learning and memory.[8] Tr. 284-87. With respect to problem-solving, Vang completed the TONI-3 which is a nonverbal intelligence test.[9] Tr. 285. She produced a test quotient of 65, a score that placed her below the 1st percentile compared to the general population. Id. However, Dr. Schuler concluded that these testing results, which measured her cognitive abilities, did not provide an accurate picture of her

---

[8]     Dr. Schuler explained that these various tests involved primarily non-verbal tasks that required little or no verbal responses, and they were chosen because they placed minimal English competency demands on the individual. Tr. 284. He cautioned the reader about the interpretation of the scores of these various tests. Id. Because of cultural differences and varying exposure to objects and information, he indicated that individuals with more education are more likely to perform better on these measures, and that frequently good performance on specific measures are more informative than poor performance. Tr. 284-285.

[9]     According to Dr. Barron, the TONI-3 stands for Test of Nonverbal Intelligence-III. Tr. 328. The product description for the test states:

> The TONI-3, a major revision of the popular and well-built Test of Nonverbal Intelligence, is a norm-referenced measure of intelligence, aptitude, abstract reasoning, and problem solving that is completely free of the use of language. The test requires no reading, writing, speaking, or listening on the part of the test subject. It is completely nonverbal and largely motor-free, requiring only a point, nod, or symbolic gesture to indicate response choices.

http://www.pearsonassessments.com/HAIWEB/Cultures/en-us/Productdetail.htm?Pid=PAa19100&Mode=summary.

general cognitive abilities due to cultural disparities.  Id.  Rather, he believed that her level of functioning fell at least within the borderline region, if not higher.  Id.

On attention abilities, Dr. Schuler stated that Vang displayed no difficulty in performing a simple focused attention task, indicating that she repeated the names of three common objects twice consecutively after a single presentation.  Tr. 285.  However, on a spatial span subtest of WMS-III,[10] Vang's performance fell between the 1st and 12th percentiles when compared to several populations raised in this country with similar education.  Tr. 285.  Dr. Schuler indicated that her performance on this test reflected low average level of functioning, but as demands increased, he believed that her level of performance would decline because of her preoccupation with her concerns.  Tr. 286.

On processing speed and motor efficiency, Vang was administered the visual scanning task that is part of the Cross Cultural Cognitive Examination.  Tr. 286.  Vang's performance was very slow, falling below the criterion set by the exam.  Id.  However, on another test designed to measure fine motor dexterity and motor speed, her scores fell between the 8th and 55th percentile when compared to individuals raised in this country.  Id.  Taking into consideration both tests, Dr. Schuler stated that while Vang's general motor speed appears unimpaired, she does have reduced or impaired processing efficiency.  Id.

On semantic fluency, which is designed to test a person's ability to rapidly produce as many words as possible in a designated category, Vang performed at or below the 1st percentile.  Id.  Dr. Schuler felt that her slow response was associated with the decreased processing efficiency she showed on the visual scanning task.  Id.

---

[10]    WMS-III stands for Wechsler Memory Scale, Third Edition and is designed to test memory function.

On learning and memory, Dr. Schuler indicated that Vang appeared to be able to acquire new information, but her performance reflected variability in learning style and an inefficient pattern of learning this information.  Id.

Dr. Schuler opined that Vang's performance on these various tests of cognitive functioning reflected a decline in functioning that was probably associated with her depression.  Tr. 288.  In support, Dr. Schuler noted that Vang had a significant history of employment before her depression, and that Vang marked her decline in cognitive functioning as beginning with her depression which she associated with her husband's departure.  Id.  Specifically, Dr. Schuler stated that Vang displayed an impaired processing efficiency during testing that resulted in a slower rate of performance on tasks requiring cognitive processing, and that he believed that her depression, demoralization, and sense of helplessness interfered with her functioning.  Id. Nevertheless, Dr. Schuler believed that Vang is able to learn new information.  Id.

The diagnostic impression for Vang was major depressive disorder, recurrent, moderate; pain disorder associated with psychological factors; and pain disorder associated with psychological factors and medical conditions.  Tr. 288-89.  Dr. Schuler assigned Vang a GAF score of 45.  Tr. 289.

Under the section of his report entitled "Considerations," Dr. Schuler recommended that Vang continue with her medications and start support counseling. Tr. 289.  In light of her display of decreased processing efficiency during the evaluation process, Dr. Schuler stated:

> [I]n a work situation, it is likely that she would experience problems maintaining a competitive rate of work while performing tasks that required any type of visual scanning or processing.  While her fine motor scores on testing are seen as a relative strength, it is felt that her depression would interfere with a consistent rate of work performance.

Id.  Dr. Schuler also noted that should Vang reapply for Social Security benefits, he believed that "the basis for this application should be related to her decreased processing efficiency and decreased rate of work performance that is associated with her depression." Tr. 289-90.

Finally, Dr. Schuler indicated that should Vang receive Social Security benefits, he believed that she would be able to reliably manage these funds. Tr. 290.  In support, he stated that she had reported that she is able to buy groceries, she manages her household, and she pays monthly bills when necessary.  Id.

> b. August 8, 2007 Psychological Evaluation by Dr. Robert C. Barron

On August 8, 2007, Vang was seen for a psychological evaluation by Dr. Barron, at the request of the state Disability Determination Services.  Tr. 326-332.  At this time, Vang indicated that she resided with her unemployed husband and six children ranging in age from one to 17 years of age, with two of the children being preschool age. Tr. 330.

When asked about the nature of her disability, Vang said she had chronic pain in her right arm since 2003 after her husband dislocated her shoulder.  Tr. 329.  She reported she had been depressed since 2003, after her husband left her to marry another woman.  Id.  As a result, she had to care for her children.  Id.  Vang's husband returned in 2006, but they continued to have problems.  Id.  Vang's husband had been physically abusive before he left and refused to support the family.  Id.  Vang was also depressed about her physical problems, her inability to work and financial difficulties. Id.  Vang claimed that her appetite was diminished; she had difficulty sleeping due to thinking and worrying; her concentration was diminished; she lacked enjoyment in life;

and she thought about suicide with no plans or attempts.  Id.  Vang had prescriptions for

Trazadone, Wellbutrin, Fluoxetine, Remeron and Seroquel, which she was supposed to

take daily, but against her doctor's advice, did not do so because she did not like their

side effects.  Tr. 329-30.

Vang told Dr. Barron that she had worked at her previous place of employment

for 4 years until November 2005, when the third shift was terminated and she could not

work any other shift due to childcare issues.  Tr. 330.  Prior to that, Vang worked for 8

years for two other companies doing assembly work.  Id.  Vang had not sought work

since December 2005.  Id.  When asked how she could work from 2003 to 2005 (the

time period she reported severe pain to her right arm), Vang stated that her employer

was aware of her problem and reassigned her to light duties, where she could use her

left arm.  Id.

Vang normally went to bed at midnight and got up at 4:00 a.m. and napped an

hour.  Id.  She bathed four days a week, but needed help combing her hair and dressing

due to right arm pain.  Id.  Vang stated that her husband did all of the cooking.  Id.

Vang denied doing household chores (washing dishes, sweeping, mopping, vacuuming,

laundry), except for dusting three times a month.  Id.  She drove to doctor's

appointments twice a week and sometimes went the grocery store to buy water for her

children.  Id.  Vang went to the park, soccer tournaments and the Hmong New Year's

Celebration on occasion.  Id.

The advocate accompanying Vang to the evaluation was also interviewed by Dr.

Barron.  Tr. 331.  The advocate stated that after Vang's husband left her she became

extremely depressed and continued to have depression due to ongoing marital

problems.  Id.  The advocate admitted that the primary goal of his position was to assist

Vang in obtaining social security disability benefits and that he had referred Vang to Dr. Schuler for a psychological evaluation.  Id.

Dr. Barron reviewed the psychological evaluation by Dr. Schuler and noted that Dr. Schuler felt that the score obtained by Vang on the TONI-3 was "probably an underestimate of her cognitive capabilities."  Tr. 328.

Dr. Barron's diagnosis for Vang included major depressive disorder, single episode; and pain disorder associated with psychological factors and a general medical condition.  Tr. 331.

In spite of Vang's questionably valid results on the TONI-3, based on her past work history and her ability to understand questions during the evaluation, Dr. Barron opined that Vang was capable of communicating, comprehending and retaining simple directions in an entry-level employment situation.  Id.  Dr. Barron also opined that based on Vang's statements as well as Dr. Schuler's previous evaluation, her reports of current social and emotional functioning, subjective physical problems and reported significant restrictions on her daily activities of living, it appeared doubtful that she would be capable of withstanding work-related stresses, perform routine repetitive activities with reasonable persistence and pace, or meet production requirements in an entry-level employment situation.  Id.  However, he did indicate that as he had neither the benefit of any medical or mental health treatment records, he believed that further medical records or evaluations would be helpful in determining Vang's actual physical limitations.  Id.  Dr. Barron noted that Vang appeared to be able to control and direct financial benefits independently in a reasonably responsible manner.  Tr. 332.

c. <u>August, 28, 2007 Psychiatric Review by a State Agency Consultant Dr. James M. Alsdurf</u>

On August, 28, 2007, licensed psychologist Dr. Alsdurf, a state agency consultant, completed a Psychiatric Review Technique Form ("PRTF") and Mental Residual Functional Capacity Assessment Form ("MRFCA") regarding Vang for the SSA. Tr. 339-55. Under Section 12.04, Dr. Alsdurf concluded that Vang suffered from a depressive syndrome characterized by decreased energy, feelings of guilt or worthlessness and difficulty concentrating or thinking. Tr. 342. In addition, under Section 12.07 (Somatoform Disorders) Dr. Alsdurf concluded that Vang was suffering from a pain disorder. Tr. 345.

Under the B criteria of the Listings, Dr. Alsdurf indicated that Vang had mild restrictions in activities of daily living and in maintaining social functioning; moderate difficulties in maintaining concentration, persistence or pace; and no episodes of decompensation. Tr. 349. Dr. Alsdurf did not find that Vang met any of the C criteria. Tr. 350.

In the note section of the PRTF, Dr. Alsdurf summarized his examination of the record and concluded that Vang was able to provide a reasonable and lengthy description of various elements of her life. Tr. 351. Vang had no psychotic mentation;[11] she showed diminished appetite; and she had difficulty sleeping due to worrying and ongoing marital problems. Id. She was employed for four years until November 2005 and had to quit due to child care problems. Id. She indicated that she could not work as of late because of physical difficulties. Id. Vang bathed, changed clothes, dusted, swept, mopped, vacuumed, did the laundry, went to the grocery store, watched TV,

---

[11]    Mentation: "The process of reasoning and thinking." Stedman's Medical Dictionary, 1092 (27th ed. 2000).

listed to the radio, and went to soccer tournaments and Hmong New Years.[12]  Id.

According to Dr. Alsdurf, Vang's physical factors appeared to be the prominent area of

limitation.  Id.

On the MRFCA, Dr. Alsdurf reached the following conclusions:

> The claimant's retains the capacity to concentrate on, understand, and remember routine, repetitive tasks, and three and four step, uncomplicated instructions, but would have moderate problems with detailed, and marked problems with complex, instructions.

> The claimant's ability to carry out tasks with adequate persistence and pace would be moderately impaired, but adequate for routine, repetitive tasks, but not for detailed or complex tasks.

> The claimant's ability to interact and get along with co-workers would be moderately impaired, but adequate for brief and superficial contact.

> The claimant's ability to interact with the public would be moderately impaired, but adequate for brief and superficial contact.

> The claimant's ability to follow an ordinary routine would be moderately impaired, but adequate to function with the ordinary level of supervision found in most customary work settings.

> The claimant's ability to handle stress would be moderately impaired, but adequate to tolerate the routine stressors of a routine, repetitive and a three and four step work setting.

Tr. 355.  On March 8, 2008 licensed physiologist Dr. R. Owen Nelsen, Ph.D. affirmed

the assessment by Dr. Alsdurf.  Tr. 469-70.

---

[12]     It is not clear whether Dr. Alsdurf's commentary was based on his review of or Dr. Schuler's or Dr. Barron's reports.  If it was based on Dr. Schuler's evaluation, Dr. Alsdurf's description of Vang's activities fairly summarized what Dr. Schuler had written. However, if was based on Dr. Barron's description of Vang's daily activities, according to Dr. Barron, Vang denied washing dishes, sweeping, mopping, vacuuming, laundry, watching TV or listening to the radio.

d. <u>September 5, 2009 Responses to Interrogatories from the ALJ by Dr. Karen Butler, Ph.D</u>.

At the request for the ALJ, on September 5, 2009, clinical psychologist Dr. Karen Butler answered interrogatories based on her review of the evidenced provided.[13]  Tr. 606, 616-22.  According to Dr. Butler, the record showed that Vang was suffering from major depression, recurrent, ranging from partially remitted to severe, and a pain disorder.  Tr. 616 (citing Tr. 280-310, 326-32, 384-437, 574-605).[14]  Dr. Butler found that none of Vang's impairments, combined or separately, met or equaled any impairment described in the Listing of Impairments.  <u>Id.</u>  Dr. Butler also found that Vang's major depression was a severe impairment based on the evidence in the record which showed that Vang was in a sad and depressed mood; she had an appetite and sleep disturbance, low energy, diminished concentration and memory, and feelings of hopelessness and helplessness.  Tr. 617 (citing Tr. 280-310, 326-32, 384-437, 574-605).  Dr. Butler concluded that Vang's pain disorder was a severe impairment based on evidence in the record that Vang was suffering from pain.  Tr. 617 (citing Tr. 280-310, 326-32, 384-437, 574-605).

---

[13]    In her response, Dr. Butler indicated that she was relying on Exhibits 1F through 32F.  Assuming that these exhibits were numbered in the same fashion as that provided to the Court, Exhibits 1F through 32F reflect medical and mental health records generated from March 2006 through July 2009.  Dr. Butler was not provided with Exhibits 35F through 38F, which were the counseling notes of Dr. Hoistad and Moua generated after July 13, 2009, or the progress notes from Thersleff generated from June 15 through November 23, 2009.  Exhibits 35F through 38F were provided to the ALJ by Vang's counsel in December 2009.  Tr. 623-24, 645, 660, 667-669.

[14]    Dr. Butler actually cited to Exhibits, 3F, 5F, 11F, 19F and 32F which correspond to Tr. 280-290, 302-310, 326-32, 384-437, 574-605.  These pages from the transcript are Dr. Schuler's report, Dr. Johnson's records through June, 2007, Dr. Barron's report, and Dr. Hoistad's records from March 14, 2006 through February, 2008, and November 24, 2008 through July 13, 2009.

Under the "B" criteria, Dr. Butler assessed Vang's level of function. Tr. 617. Dr. Butler concluded that Vang had a moderate impairment of restrictions of activities of daily living based on reports in the record that sometimes Vang was only able to shop and count change, but on other occasions, she was able to get her children ready for school, cook for her family, sweep, and vacuum.[15] Id. (citing Tr. 146-67, 179-89).[16]

Dr. Butler opined that Vang had a moderate impairment in maintaining social functioning. Tr. 617. Dr. Butler made this finding based on Vang's reports of her family visiting her once or twice a week, visiting her friends once a week, attending a Hmong New Year's celebration, and attending Hmong funerals. Id. (citing Tr. 146-67, 280-90).[17]

Dr. Butler assessed Vang with a moderate impairment to her ability to maintain concentration, persistence and pace. Tr. 617 (citing Tr. 269-605).[18] Dr. Butler found no evidence of any episodes of decompensation. Id. (citing same).

Dr. Butler determined that the evidence in the record did not establish the "C" criteria. Tr. 618. She made this finding on the basis that Vang's depression waxed and waned between 2006-2008 largely around her marital conflict and the acting out of her

---

[15]    It appears that Dr. Butler may have listed other examples of what Vang could do on another page of her response, but it was not included in the exhibit.

[16]    These exhibits are the function reports by Vang, her husband and daughter. Whether Dr. Butler cited to other exhibits on the page not included in the record is not known.

[17]    These exhibits are the function reports by Vang, her husband and daughter, and Dr. Schuler's report.

[18]    This citation is to the entire record, Exhibits 1F through 32F.

children, and because Vang's depression was noted as partially remitted, mild or moderate.[19]  Id.

Dr. Butler placed the following work restrictions on Vang: she should be limited to simple and unskilled work that is visually demonstrated; she should have no rapid pace in her work; she should not have any rapid production goals; she should have no public contact; and she should have only brief and superficial contact with co-workers and supervisors.  Id.  Citing to the records of Drs. Hoistad and Johnson, Dr. Butler maintained that the earliest date that these limitations would have applied to Vang was March 2006.  Tr. 619 (citing Tr. 384-445), 621.

Dr. Butler also filled out a Medical Source Statement of Ability to do Work-Related Activities (Mental) form relating to Vang.  Tr. 620-22.  Dr. Butler opined that Vang had a moderate limitation as it related to being able to understand and remember simple instructions, carry out simple instructions and to make judgments on simple work-related decisions; and a marked limitation as it related to being able to carry out complex instructions, understand and remember complex instructions, and to make judgments on complex work-related decisions.  Tr. 620.  Dr. Butler based these findings on Vang's history of factory work, reported activities of daily living, and her ability to handle finances when no help was available.  Id.

As to her ability to interact with others, Dr. Butler indicated that Vang had a moderate limitation in interacting appropriately with supervisors and co-workers; and a marked limitation in interacting appropriately with the public, and responding to usual work situations and to changes in a routine work setting.  Tr. 621.  Dr. Butler based

_____

[19]    Dr. Butler also started to comment on Vang's consistent level of functioning in 2009, but again it appears that the balance of her comments were on another page which was not included in the exhibit.  Tr. 618.

these findings on the fact that Vang did not speak English, and she had difficulty responding to changes in her daily routine brought on by her children's misbehavior and legal involvements.  Id.

Dr. Butler indicated that Vang could manage benefits in her best interest.  Tr. 621.

### D. <u>Hearing Before The Administrative Law Judge</u>

Vang appeared at a hearing before the ALJ on January 15, 2010.  Tr. 20-46. Vang testified that she had separated from her husband in 2007.  Tr. 27.  She had nine children, five of whom still lived with her.  Id.  The children living at home ranged from age three to 17 years of age.  Id.  Vang indicated that she was the primary caretaker of the three-year old and that her older son watched the youngest when she was not there. Id.  Vang had a driver's license and access to vehicle.  Id.  Vang testified that she was able to drive and she drove her daughters to the Laundromat or the grocery store.  Tr. 28, 32.  Vang lost her job because her shift was laid off.  Id.  Vang had not been hospitalized for depression or anxiety.  Tr. 29-30.  Vang was taking medications for depression, but she did not feel that they were helping her.  Tr. 30.  According to Vang, her children did all of the cooking, housework (making beds, taking out garbage) and grocery shopping.  Tr. 31.  She did not go to church or listen to music, but watched television for about 10 minutes.  Tr. 31-32.  She has difficulty falling asleep, indicating that after taking medication, she finally falls asleep around 1:00 or 2:00 a.m., but that only lasts for about four hours.  Tr. 32-33.  Vang testified that she had not gone to the Hmong Soccer tournament or the Hmong New Year's Celebration that year.  Tr. 33. She showers about three times a week with the assistance of her children.  Id.

During a typical day, Vang was alone at home with her three-year old at least three days a week, and she fed the child because it was prepared in advance. Tr. 33-34. The child watched television and played with toys. Tr. 34. Vang's other children started coming home from school at 2:20 p.m. Id. Vang said she used to enjoy working but she cannot work anymore. Id.

Following the testimony of the medical expert regarding Vang's physical impairments, (Tr. 36-39), the ALJ gave the VE the following hypothetical:

> If I have you assume that we're discussing an individual here with … a second grade education of the age-range of 40 to 45 years, with past work as set out in your report at 15E, she would be limited to the residual functional capacity that Dr. Steiner gave for this first hypothetical in the light range, which means lifting up to 20 pounds on an occasional basis, 10 pounds frequently, although she would be limited from the full range by prohibiting right overhead tasks with the right upper extremity. From her left upper extremity, power gripping, she'd be prohibited or working at high--where there's high concentrations of air pollutants. From the non-exertional side, she'd be limited to essentially, simple, unskilled visually demonstrated or demonstrable tasks with no rapid pace or high production goals and jobs with no public contact and only brief superficial contact with coworkers and supervisors. With those limits, could a person do any of the past jobs?

Tr. 41. The VE testified that such a person could work in Vang's prior position in unskilled assembly as it is normally performed. Id.

The ALJ then modified the hypothetical and asked the VE to assume the same physical limitations given by Dr. Steiner, but with different non-exertional limitations to essentially simple directions and entry-level employment with routine, repetitive tasks. Tr. 41. The VE opined that such a person could perform their past work of unskilled assembly as it is normally performed. Tr. 41-42.

## V.    DISCUSSION

Vang alleged four errors in the Commissioner's decision.  First, Vang contended the ALJ erred by giving greater weight to non-examining and non-treating doctors than to four treating and examining sources.  See Plaintiff's Memorandum in Support of Summary Judgment [Docket No. 10] ("Pl.'s Mem."), p. 12.  In particular, Vang asserted that the ALJ gave improper weight to the opinions of Dr. Butler, Drs. Alsdurf and Nelsen, failed to give due weight to the opinion of Dr. Schuler, misinterpreted and then failed to credit the opinions of Dr. Barron, failed to give controlling weight to the opinion of long-time treating psychologist Dr. Hoistad, and failed to give due weight to the opinions of psychiatric nurse practitioner Thersleff.  Id., pp. 14-26.

Second, Vang argued that the ALJ's decision was unsupported because it rested almost entirely on the misreading of the opinion of non-treating, non-examining source, Dr. Butler, who had access to an incomplete record and accordingly, her opinion was not entitled to any deference.  Id., pp. 26-35.  In support, Vang asserted that the ALJ never addressed Dr. Butler's determinations that Vang had a marked limitation in the area of difficulties in acting appropriately with the public, and she was markedly impaired in responding appropriately to usual work situations and changes in a routine work setting.  Id, pp. 26-27 (citing Tr. 621).  Relying on SSR 85-15 and SSR 85-16, Vang submitted that the inability to deal with changes in a routine work setting could severely limit the potential occupational base.  Id.  Consequently, the ALJ's failure to include Vang's inability to respond to usual work situations or changes in a routine work setting in his hypothetical to the VE was legal error.  Id., pp. 27-28.

Vang further claimed that Dr. Butler's opinion that Vang did not meet the Listings does not constitute substantial evidence to overcome the opinions of four treating or

examining health professionals. In particular, Vang contended that Dr. Butler's opinion was only based on records up through September 5, 2009; Dr. Butler's opinions conflicted with all of the four treating and examining mental health professionals' opinions; and Dr. Butler's findings that Vang had only moderate restrictions in the activities of daily living and only moderate difficulties in maintaining concentration, persistence or pace, were not supported by the medical record. Id., pp. 28-35.

Third, Vang asserted that her impairments met or equaled Listings 12.04, 12.06 and 12.07 based on her GAF scores of 50 or less (save one) and the fact that she met the Part B criteria with marked impairments of activities of daily living and concentration, persistence or pace. Id., p. 36.

Fourth, Vang claimed that she does not have the requisite RFC to work given the opinions of the various medical sources, and her inability to withstand work stresses and inability to meet pace, persistence and production standards in competitive job market. Id., pp. 26-28. In addition, she maintained that the ALJ improperly evaluated her ability to engage in daily activities. Id., pp. 36-38

Defendant countered that the ALJ reasonably considered the available medical source opinions, including her treating providers Dr. Hoistad and Thersleff, consultative examiners, Drs. Schuler and Barron, and the reviewing sources, Drs. Alsdurf, Nelsen and Butler. See Defendant's Memorandum in Support of Motion for Summary Judgment [Docket No. 13], pp. 10-20.

Defendant also maintained that the ALJ reasonably found Vang's claims of debilitating pain and symptoms were not fully credible and cited numerous records for his findings, including evidence regarding her activities, non-compliance, work history, and inconsistent statements regarding her activities. Id., pp. 21-22.

Finally, defendant argued that the substantial evidence in the record supported the ALJ's finding that Vang's impairments, considered by itself or in combination, did not meet or medically equal a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1 and the RFC assigned to Vang. Id., p. 23.

In reply, Vang again reiterated that the ALJ's reliance on non-examining, no-treating doctors instead of all treating and examining sources who corroborated each was other, was reversible legal error. See Plaintiff's Reply Memorandum in Support of Summary Judgment [Docket No. 14] ("Pl. Reply"), pp. 2-6. Further, Vang claimed that there were no significant inconsistencies in the record regarding her daily activities to warrant a negative credibility finding. Id., pp. 6-7.

The Court addresses each argument within the framework of the five-step disability analysis, beginning at the third step – i.e., whether Vang met or equaled a listed impairment.

### A.   Listing 12.04[20]

The regulations provide that certain impairments are considered "severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." 20 C.F.R. §§ 404.1525(a), 416.925(a). Such conditions are described in the Listing of Impairments, 20 C.F.R. § 404, Subpart P, Appendix 1. Depression is analyzed under Listing 12.04, affective disorders. See

---

[20] Vang also asserted that she met the Listings for an anxiety disorder under Listing 12.06 and for somatoform disorder under Listing 12.07, but offered no argument or evidence as to why she met these listings. See Pl.'s Mem., p. 36. The ALJ made no findings with regard to these disorders. Tr. 12-13. The Court will not divine a basis on Vang's behalf as to why she met the "paragraph A" criteria for these listings, which are clinical findings used to establish whether the claimant has a medically determinable mental disorder. Russell v. Sullivan, 950 F.2d 542, 544 (8th Cir. 1991) (citing 20 C.F.R. Part 404, Subpt. P, App. 1, § 12.00 A).

Randolph v. Barnhart, 386 F.3d 835, 840 (8th Cir. 2004) (analyzing major depressive disorder under Listing 12.04).

Vang has the burden of proof to establish that her impairment meets or equals a listing. Johnson v. Barnhart, 390 F.3d 1067, 1070 (8th Cir. 2004) (citing Sullivan v. Zebley, 493 U.S. 521, 530-31 (1990)). A listing is met when an impairment meets all of the listing's specified criteria. Id. (citing Sullivan, 493 U.S. at 530 ("An impairment that manifests only some of these criteria, no matter how severely, does not qualify.") A finding that an impairment or combination of impairments does not meet or equal a listing must be based on medical evidence. Shontos v. Barnhart, 328 F.3d 418, 424 (8th Cir. 2003) (quoting 20 C.F.R. § 404.1526(a) and (b)).

To meet Listing 12.04, paragraph A criteria (a set of medical findings) and paragraph B criteria (a set of impairment-related functional limitations), must be met. 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00(A). In addition, if paragraph B criteria are not met, then a determination must be made as to whether the paragraph C criteria are met.[21] Id. In other words, the paragraph C criteria are only addressed if the paragraph B criteria are not satisfied. Id. ("We will find that you have a listed impairment if the diagnostic description in the introductory paragraph and the criteria of both paragraphs A and B (or A and C, when appropriate) of the listed impairment are satisfied.").

The parties do not dispute that Vang met the "paragraph A" criteria of Listing 12.04, in that she suffered from a major depressive disorder. The dispute is over the ALJ's evaluation of the "paragraph B" criteria.[22] To meet the paragraph B criteria of

---

[21]    See note 1, supra for a description of the paragraph C criteria.

[22]    The only basis for Vang's challenge to Dr. Butler's conclusion that she did not meet the paragraph C criteria, was that Dr. Butler's opinion was premised on an incomplete record. Pl.'s Mem., p. 34-34. Vang offered no argument or evidence as to

Listing 12.04, Vang must prove that her depression, separately or together, resulted in at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence or pace; or repeated episodes of decompensation, each of extended duration. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04(b). "Marked" is defined as more than moderate, but less than extreme. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(C). "A marked limitation may arise when several activities or functions are impaired, or even when only one is impaired, as long as the degree of limitations is such as to interfere seriously with your ability to function independently, appropriately, effectively, and on a sustained basis." Id.

### 1. Restrictions of Plaintiff's Activities of Daily Living

The SSA regulations define "activities of daily living" as follows:

> Activities of daily living include adaptive activities such as cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for your grooming and hygiene, using telephones and directories, and using a post office. In the context of your overall situation, we assess the quality of these activities by their independence, appropriateness, effectiveness, and sustainability. We will determine the extent to which you are capable of initiating and participating in activities independent of supervision or direction.

> We do not define "marked" by a specific number of different activities of daily living in which functioning is impaired, but by the nature and overall degree of interference with function. For example, if you do a wide range of activities of daily living, we may still find that you have a marked limitation in your daily activities if you have serious difficulty performing them without direct supervision, or in a suitable

---

why she met the paragraph C criteria. In any event, "the final responsibility for determining whether an impairment reaches listing level is for the Commissioner." Randolph, 386 F.3d at 840 (quoting 20 C.F.R. §§ 404.1527(e)(2) & 416.927(e)(2)); see also Soc. Sec. Ruling 96–5p ("[T]reating source opinions on issues that are reserved to the Commissioner are never entitled to controlling weight.") (emphasis added).

> manner, or on a consistent, useful, routine basis, or without
> undue interruptions or distractions.

See 20 CFR Pt. 404, Subpt. P, App. 1, § 12.00(C)(1) (Mental Disorders, Assessment of Severity).

Relying on the Dr. Butler's opinion and evidence of Vang daily activities as reported by Vang to Dr. Schuler, the ALJ found only a moderate restriction in her activities of daily living. Tr. 14. This Court concludes that this determination is supported by the substantial evidence in the record.

On March 15, 2007, Vang told Dr. Schuler that she had been suffering from depression since 2000 after she and her husband separated. Tr. 281, 287. Her husband returned to the family in 2005 but she continued to be depressed because she is never sure he will stay with her. Tr. 282, 287. Vang stated that she began her day at 6:00 a.m. in order to help her children prepare for school. Tr. 283. If she needed help, she would get it from the older children. Id. Vang bathed every day, did the cooking for the family, was able to sweep and vacuum, made her bed 2-3 times a day (usually with help from her children), went grocery shopping three times a week, paid bills with the help of her husband or son, could buy a money order herself to pay the bills if no one was available, and knew how to drive a car. Id. Vang was usually at home babysitting her two youngest children, tried to keep her house clean, watched some television, took walks outside when the weather was nice, visited her family twice a week, visited her friends once a week, and attended the Hmong New Year celebrations and Hmong funerals. Id. In support of his opinion that Vang could reliably manage Social Security funds, Dr. Schuler pointed to Vang's ability to buy groceries, manage the household, and pay monthly bills when necessary. Tr. 290.

Five months later, Dr. Barron examined Vang. Vang told Dr. Barron that she had been depressed since 2003. Tr. 329. She also informed him that she left her employment in November 2005, not because of allegedly debilitating depression or other mentally related issues, but because the third shift where she worked was terminated and she could not work any other shift due to childcare issues. Tr. 329, 330. Vang also told Dr. Barron that she lived with six children, including two preschool age children, she was able to bathe herself, drive herself to doctor's appointments twice a week, go to the grocery store, and go to the park, soccer tournaments and the Hmong New Year's Celebration on occasion. Tr. 330.

Based on his review of the record, on August 28, 2007, Dr. Alsdurf indicated that Vang had mild restrictions in activities of daily living relying on evidence in the record that Vang bathes, changes clothes, dusts, sweeps, mops, vacuums, does the laundry, goes to the grocery store, watches TV, listens to the radio, and attends soccer tournaments and Hmong New Years. Tr. 351.

Dr. Butler concluded that Vang had a moderate impairment of her restrictions of activities of daily living based on evidence in the record that sometimes Vang was only able to shop and count change, but on other occasions, she was able to get her children ready for school, cook for her family, sweep, and vacuum.[23] Tr. 617.

Vang argued that the ALJ should have relied on the opinions rendered by her treating providers, Dr. Hoistad, Moua and Thersleff, that she had marked limitation as to restrictions on activities of daily living, particularly when neither Dr. Schuler nor Dr. Butler had the benefit of the complete medical record.

---

[23]     Again, as noted previously, it appears that Dr. Butler wrote more in support of her finding that Vang had moderate impairment of her restrictions of activities of daily living, but the balance of the response was not in the record. See n. 15, supra.

Acceptable medical sources to establish whether a claimant has a medically determinable impairment include licensed physicians and licensed or certified psychologists.  See 20 CFR § 404.1513(a)(1), (2).   In addition to evidence from accepted medical sources, evidence from other sources may be considered by an ALJ as to the severity of a claimant's impairment and how it affects his or her ability to work.  See 20 CFR § 404.1513(d)(1).   These other sources include nurse-practitioners and therapists.  Id.  An ALJ is not bound by any findings made by state agency medical or psychological consultants, or other program physicians or psychologists on the ultimate determination about whether a clamant is disabled.   20 CFR § 416.927(e)(2)(i).  However, because they are highly qualified specialists who are also experts in Social Security evaluation, the ALJ must consider their findings as opinion evidence.  Id.  Generally, more weight is given to the opinion of a source who has examined claimant than to the opinion of a source who has not examined a claimant.  See 20 C.F.R. § 404.1527(c)(1).

"A treating physician's opinion regarding an applicant's impairment will be granted controlling weight, provided the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record."  Hamilton v. Astrue, 518 F.3d 607, 610 (8th Cir. 2008) (quoting Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000) (citation omitted)); see also Randolph, 386 F.3d at 839 (as it pertains to the Listings, under the applicable regulations, the "ALJ will give 'a treating source's opinion on the issue[s] of the nature and severity of [an] impairment[ ]' controlling weight if such opinion 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not

inconsistent with the other substantial evidence in [the] case record.'") (quoting 20 C.F.R. §§ 404.1527(d)(2) & 416.927(d)(2)).

On the mental impairment questionnaire dated December 9, 2009, Dr. Hoistad and Moua checked that Vang had a marked limitation as to restrictions of daily living. Tr. 643. Likewise, certified nurse practitioner Thersleff checked that Vang had marked limitation as to restrictions of daily living. Tr. 665. However, in reviewing the treatment notes of Dr. Hoistad and Thersleff, there is nothing in them to indicate that Vang was not able to perform daily activities based on her depression. To the contrary, Dr. Hoistad's treatment records show that Vang reported that she cooked for her family; she complained that she could not return to work or school because she had two small children to care for; and she reported being stressed about having to take care of the family and feeling like she was "wearing the pants in the home." Tr. 388, 392, 412, 413. Further, Vang reported to Dr. Hoistad that she engaged in very little social activities because she did not have the time and she was depressed about taking care of her children. Tr. 436.

There is nothing in the initial intake report or progress notes by Thersleff that made any mention of the impact of Vang's depression on her ability to engage in daily activities. "A treating physician's opinion does not deserve controlling weight when it is nothing more than a conclusory statement." Hamilton, 518 F.3d at 610 (citing Piepgras v. Chater, 76 F.3d 233, 236 (8th Cir. 1996)); see also Thomas v. Sullivan, 928 F.2d 255, 259 (8th Cir. 1991) (holding that the weight given to a treating physician's opinion is limited if the opinion consists only of conclusory statements). Moreover, checking a box on a form, without more, cannot amount to substantial evidence. O'Leary v. Schweiker, 710 F.2d 1334, 1341 (8th Cir. 1983) ("Because of the interpretive problems inherent in

the use of forms such as the physical capacities checklist, our Court has held that while these forms are admissible, they are entitled to little weight and do not constitute "substantial evidence" on the record as a whole.") (citations omitted); see also Swigert v. Astrue, 226 Fed.Appx. 628, 2007 WL 913875 (8th Cir. 2007) ("A treating physician's checkmarks on an MSS form may be discounted if they are contradicted by other objective medical evidence in the record.") (citations omitted).

Even at the hearing, Vang testified that she was alone with three year old at least three days a week, until the other children returned home in the afternoon, and she was able to drive her family around. Tr. 30-32.

The opinions of Dr. Hoistad, Moua and Thersleff that Vang had marked limitation as to restrictions of daily living conflicts with or is not supported by their treating records and the record as a whole. Consequently, the Court finds that the ALJ did not error in failing to give those opinions substantial weight. See Howe v. Astrue, 499 F.3d 835, 839 (8th Cir. 2007) ("[A] treating physician's opinion is afforded less deference when the medical evidence in the record as a whole contradicts the opinion."). Further, the record reflects that Vang's depression set in following the departure of her husband from the home (in 2000 according to what she told Dr. Schuler; in 2003 according to what she reported to Dr. Barron and Thersleff). Yet, despite this depression, she not only worked for several years, but at the same time, without any assistance from her husband, she cared for her family and home. And she only left her job in 2005, the date she alleges the onset of her disability, not because of depression or any other impairment, but because her shift was laid off. This additional evidence in the record supports the conclusion that she was not markedly impaired in her activities of daily living.

This Court has no doubt that Vang's family problems and responsibilities were stressful to her and contributed to her depression. Nevertheless, her ability to care for herself, her home and children, along with the activities she engaged in outside the home, including working for a significant period of time, substantiates the ALJ's determination that she was not markedly impaired in her activities of daily living. For all of these reasons, based on the record as a whole, including the opinions of the consultants, the medical record and the reports pertaining to Vang's activities, the Court concludes that the ALJ's finding that Vang had a moderate restriction in activities of daily living was based on substantial evidence in the record.

### 2. Difficulties in Maintaining Social Functioning

The SSA regulations define "social functioning" as follows:

> Social functioning refers to your capacity to interact independently, appropriately, effectively, and on a sustained basis with other individuals. Social functioning includes the ability to get along with others, such as family members, friends, neighbors, grocery clerks, landlords, or bus drivers. You may demonstrate impaired social functioning by, for example, a history of altercations, evictions, firings, fear of strangers, avoidance of interpersonal relationships, or social isolation. You may exhibit strength in social functioning by such things as your ability to initiate social contacts with others, communicate clearly with others, or interact and actively participate in group activities. We also need to consider cooperative behaviors, consideration for others, awareness of others' feelings, and social maturity. Social functioning in work situations may involve interactions with the public, responding appropriately to persons in authority (e.g., supervisors), or cooperative behaviors involving coworkers.

> We do not define "marked" by a specific number of different behaviors in which social functioning is impaired, but by the nature and overall degree of interference with function. For example, if you are highly antagonistic, uncooperative, or hostile but are tolerated by local storekeepers, we may nevertheless find that you have a marked limitation in social

> functioning because that behavior is not acceptable in other social contexts.

See 20 CFR Pt. 404, Subpt. P, App. 1, § 12.00(C)(2) (Mental Disorders, Assessment of Severity).

The ALJ found that Vang had moderate difficulties in social functioning. Tr. 14. The ALJ relied on the opinion of Dr. Butler for this finding. Id. The ALJ also based his determination on the evidence in the record that showed that Vang got along well with her children, examining psychologist Dr. Barron found her responses were logical and goal directed, and she was able to shop on a regular basis, all of which suggested that she was able to go out into the public and tolerate at least superficial interactions with others. Id. The Court concludes that the ALJ's finding is supported by substantial evidence in the record.

Vang's longtime treating providers, Dr. Hoistad and Moua, opined that Vang only had a moderate, as opposed to marked, limitation as it relates to difficulties in social functioning. Tr. 643. As for Dr. Schuler, Vang reported to him that she did not have any ongoing arguments with anyone. Tr. 283. While Dr. Barron opined that it was doubtful that Vang would be able to work, in part, because of her current social functioning, he did not explain why he believed her social functioning was deficient. Tr. 331. To the contrary, Dr. Barron found that Vang was able to communicate in a manner that was adequate for an entry-level employment situation based on her ability to answer questions during the interview, including that she was able to provide reasonable lengthy, detailed, logical and goal-oriented responses while being an adequate historian. Tr. 328, 329, 331. Id. Further, Vang reported to Dr. Barron that she went to the park, soccer tournaments and the Hmong New Year's Celebration on occasion. Tr. 330.

Without any explanation, Thersleff checked that Vang had a marked limitation as it related to difficulties in social functioning. Tr. 665. Without more, this cannot amount to substantial evidence. O'Leary, 710 F.2d at 1341. However, Thersleff also opined that Vang had a fair ability to interact appropriately with the general public, maintain socially appropriate behavior, and get along with co-workers. Tr. 663-64. There was nothing in Thersleff's notes to indicate Vang could not socially function, except for Vang's report at the initial intake that she had a short temper. Tr. 656.

Dr. Butler opined that Vang had a moderate impairment in maintain social functioning based on her reports of her family visiting her once or twice a week, visiting her friends once a week, attending a Hmong New Year's celebration and attending Hmong funerals. Tr. 617. Dr. Alsdurf indicated that Vang had mild restrictions in maintaining social functioning, and Dr. Nelsen affirmed this determination. Tr. 349, 469. At the hearing, Vang's testimony suggested that she was able to function with her family. Tr. 27-39.

The record as a whole, including the comments and opinions of Vang's treating psychologist and therapist, Dr. Hoistad and Moua, supports the ALJ's conclusion that Vang had only moderate difficulties in social functioning. For all of these reasons, based on the record as a whole, the Court concludes that the ALJ's finding that Vang had a moderate restriction in social functioning was based on substantial evidence in the record.

### 3. Difficulties in Maintaining Concentration, Persistence or Pace

The SSA regulations define concentration, persistence, or pace as follows:

> Concentration, persistence, or pace refers to the ability to sustain focused attention and concentration sufficiently long to permit the timely and appropriate completion of tasks commonly found in work settings. Limitations in

concentration, persistence, or pace are best observed in work settings, but may also be reflected by limitations in other settings. In addition, major limitations in this area can often be assessed through clinical examination or psychological testing. Wherever possible, however, a mental status examination or psychological test data should be supplemented by other available evidence.

On mental status examinations, concentration is assessed by tasks such as having you subtract serial sevens or serial threes from 100. In psychological tests of intelligence or memory, concentration is assessed through tasks requiring short-term memory or through tasks that must be completed within established time limits.

In work evaluations, concentration, persistence, or pace is assessed by testing your ability to sustain work using appropriate production standards, in either real or simulated work tasks (e.g., filing index cards, locating telephone numbers, or disassembling and reassembling objects). Strengths and weaknesses in areas of concentration and attention can be discussed in terms of your ability to work at a consistent pace for acceptable periods of time and until a task is completed, and your ability to repeat sequences of action to achieve a goal or an objective.

We do not define "marked" by a specific number of tasks that you are unable to complete, but by the nature and overall degree of interference with function. You may be able to sustain attention and persist at simple tasks but may still have difficulty with complicated tasks. Deficiencies that are apparent only in performing complex procedures or tasks would not satisfy the intent of this paragraph B criterion. However, if you can complete many simple tasks, we may nevertheless find that you have a marked limitation in concentration, persistence, or pace if you cannot complete these tasks without extra supervision or assistance, or in accordance with quality and accuracy standards, or at a consistent pace without an unreasonable number and length of rest periods, or without undue interruptions or distractions.

See 20 CFR Pt. 404, Subpt. P, App. 1, § 12.00(C)(3) (Mental Disorders, Assessment of

Severity).

The ALJ determined that Vang had a moderate ability to maintain concentration,

persistence or pace based on Dr. Butler's opinion.  Tr. 14.  The ALJ acknowledged that

Vang had asserted to Dr. Schuler that she had memory problems (citing Tr. 287), but noted that during her mental status examination with Dr. Schuler she displayed no difficulty in performing a simple focused attention task. Tr. 14-15 (citing Tr. 285).

Neither Dr. Schuler nor Dr. Barron opined on Vang's level of impairment with respect to concentration, persistence or pace. However, based on performance testing that Vang underwent, in March 2007, Dr. Schuler stated that Vang's general cognitive abilities were likely in the borderline range if not higher; she had no problem performing a simple focused task; her processing speed was impaired; her general motor speed was not impaired; and she demonstrated the ability to acquire and retrieve novel information but displayed variability in learning style and an inefficient pattern of learning this information. Tr. 285-87. Dr. Schuler opined that that Vang's decreased processing efficiency caused by her depression would interfere with a consistent rate of work performance. Tr. 289.

Dr. Barron opined in August 2007 that it appeared doubtful that Vang would be capable of withstanding work-related stresses, perform routine repetitive activities with reasonable persistence and pace, or meet production requirements in an entry-level employment situation. Tr. 331. Dr. Barron based that opinion on Dr. Schuler's evaluation, and Vang's statements to bearing on current social and emotional functioning, subjective physical problems, and her daily activities of living. Id.

Based on his review of the medical records, including the reports of Drs. Schuler and Barron, in September 2007, Dr. Alsdurf assessed Vang with a moderate impairment in her ability in maintaining concentration, persistence and pace, and Dr. Nelsen affirmed. Tr. 349, 469.

In December 2009, Dr. Hoistad and Moua filled out a mental impairment questionnaire and checked that Vang had a marked limitation as to maintaining concentration, persistence or pace. Tr. 643. They noted that Vang had a poor ability to concentrate or focus. Tr. 642. In Dr. Hoistad's treatment notes, he wrote under the Mental Status section that her attention/concentration was limited or poor; her thought processes were fair, limited or poor; and her associations and memory was fair, limited, poor; and under the section entitled "Symptoms," he checked from time-to-time "inability to focus" and "concentration/focus."[24] Tr. 387-433, 487-509.

Thersleff also checked in December 2009 in the mental impairment questionnaire that Vang had a marked limitation as to maintaining concentration, persistence or pace. Tr. 665. There was no mention in Thersleff's progress notes to Vang's memory, ability to focus, persistence or pace. Dr. Johnson, Vang's treating psychiatrist, from June 2006 through April 2009 never addressed Vang's memory, ability to focus, concentration, persistence or pace in his records.

The standards of review by this Court are clear.

> [R]eview of the Commissioner's denial of benefits is limited to whether the decision is "supported by substantial evidence in the record as a whole." Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir.2000) (internal quotations and citations omitted). Substantial evidence exists if "a reasonable mind would find such evidence adequate." Id. Substantial evidence is "less than a preponderance, but enough that a reasonable mind would find it adequate to support the ALJ's decision." Gonzales v. Barnhart, 465 F.3d 890, 894 (8th Cir.2006). Substantial evidence means more than a mere scintilla. Neal v. Barnhart, 405 F.3d 685, 688 (8th Cir.2005). We may not reverse merely because

---

[24] There is no indication from these notations on the nature or extent of the problem with Vang's memory, focus or concentration, let alone whether the issue was the type that would correlate with a marked limitation. See Piepgras, 76 F.3d at 236 (finding that and ALJ may disregard an opinion that "consist[s] of nothing more than vague, conclusory statements.").

> substantial evidence may also support an opposite
> conclusion. <u>Nevland</u>, 204 F.3d at 857.

<u>Slusser</u>, 557 F.3d at 925. Further, the possibility that the Court could draw two inconsistent conclusions from the same record does not prevent a particular finding from being supported by substantial evidence. <u>Culbertson</u>, 30 F.3d at 939.

To find a marked impairment, the SSA regulations state that the ALJ must examine the nature and overall degree of interference with function. <u>See</u> 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(C). In addition, regulations explain that the ability to sustain attention and persist at simple tasks, but not complicated tasks, does not satisfy the paragraph B criterion. <u>See</u> 20 CFR Pt. 404, Subpt. P, App. 1, § 12.00(C)(3).

Based on these standards and upon review of the record as a whole, this Court cannot conclude that the ALJ erred in his determination that Vang had a moderate ability to maintain concentration, persistence or pace. Here, the opinions from the various sources were conflicting, and the fact that there is support for a different conclusion – <u>i.e.</u> that Vang was markedly impaired – is not determinative. <u>Culbertson</u>, 30 F.3d at 939. The evaluations of Drs. Schuler and Barron in 2007 suggested that Vang's ability to process information was compromised and would affect her ability to maintain a consistent rate of work performance. At the same time, however, Dr. Schuler indicated that Vang could perform a simple focused attention task, she could learn new information, and her general motor speed was not impaired. In December 2009, Dr. Hoistad, Moua and Thersleff opined that Vang's ability to maintain concentration, persistence or pace was markedly impaired. But based on her review of the record through July 2009, including the records of Drs. Schuler, Barron, Hoistad and

Johnson, along with Thersleff's progress notes,[25] Dr. Butler opined that Vang had a moderate ability to maintain concentration, persistence or pace.  Nothing about Vang's work history indicated that she was markedly impaired.  To the contrary, Vang worked as an assembler for several years while she was suffering from the very depression at issue here.  She was terminated, not due the depression or failure to perform the demands of her job, but because her shift was eliminated.

In short, there is no dispute that Vang was suffering from depression during the relevant timeframe.  However, just because she is suffering from depression does not mean that she cannot perform routine repetitive activities with reasonable pace and persistence.  Indeed, despite her depression, Vang was able to work until November 2005 and only left job because her shift was terminated and she had no daycare to work the other shifts.  Tr. 281.  Vang even admitted to Dr. Hoistad in December 2007 that she did not want to find work or go to school because she had two small children and her husband had run off.  Tr. 392.  She did not leave her job because of performance deficiencies; she did not report that she could work or go to school because she was so depressed that she could not concentrate.  Id.  While Dr. Barron in August 2007 may have had doubts as to whether Vang could perform routine repetitive activities with reasonable persistence and pace, or meet production requirements in an entry-level employment situation, the ALJ had significant evidence in the record to the contrary.  On review of the record as a whole, the Court concludes that the ALJ's finding that

---

[25]    While it is true that when Dr. Butler answered the ALJ's interrogatories, she did not have the benefit of the mental impairment questionnaires prepared by Dr. Hoistad, Moua and Thersleff in December 2009, Dr. Butler did have the benefit of the treatment records of Dr. Hoistad, Moua and Thersleff, along with Dr. Johnson's records, through July 2009, including Dr. Hoistad's treatment notes addressing Vang's memory, concentration and focus.

Vang had a moderate impairment in her ability in maintaining concentration, persistence and pace to be supported by substantial evidence in the record.

### 4. Conclusion

For all the reasons stated above, the Court finds that the ALJ's determination that Vang's depression did not meet or equal Listing 12.04 is supported by substantial evidence in the record.[26]

### B. Residual Functional Capacity Determination

A claimant's RFC is what he or she can do despite his or her limitations. 20 C.F.R. § 416.945(a)(1). The ALJ must determine a claimant's RFC by considering the combination of the claimant's mental and physical impairments. See Baldwin v. Barnhart, 349 F.3d 549, 556 (8th Cir. 2003). However, it is the claimant's burden, not the Commissioner's, to prove the RFC. Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001) (citing Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir. 1995)).

---

[26] Even if the Court had found substantial evidence in the record supported a marked limitation in Vang's ability to maintain concentration, persistence and pace, the Court still would have concluded that Vang's severe impairment of depression did not meet or equal Listing 12.04. To meet the "paragraph B" criteria, Vang must establish that she is markedly impaired on two of the three dimensions. Here, the Court has already upheld the ALJ's findings that she was only moderately impaired as to her activities of daily living and her ability to socially interact. Thus, the Court could not have concluded that she met the "paragraph B" criteria, without the additional finding of repeated episodes of decompensation. See 20 C.F.R. § 404, Subpart B, Appendix 1, § 12.04(b). But Vang did not argue that she had suffered from repeated episodes of decompensation. Therefore, the argument is waived. See Craig, 212 F.3d at 437; see also Yeazel, 148 F.3d at 911-12 (citing Roth, 27 F.3d at 1307) (finding failure to raise an issue before this Court results in waiver of that argument)). Moreover, there is no evidence of repeated episodes of decompensation. The only mention of decompensation was the box checked by Dr. Hoistad and Moua in the mental impairment questionnaire indicating that Vang had repeated episodes of decompensation. Tr. 643. For support, they stated that she would "sleep for a few days with low energy." Id. The phrase "repeated episodes of decompensation, each of extended duration" means "three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(C)(4). Sleeping for a few days does not satisfy this requirement.

In determining a claimant's RFC, the ALJ must consider all relevant evidence, including medical records, observations of treating physicians and others, and the claimant's own descriptions of his or her limitations. Id. The RFC determination must be supported by "medical evidence that addresses claimant's ability to function in the workplace[.]" Baldwin, 349 F.3d at 556 (quoting Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir. 2000)). However, the ALJ is not limited solely to consideration of medical evidence, "but is required to consider at least some supporting evidence from a professional." Baldwin, 439 F.3d at 556 (citing 20 C.F.R. § 404.1545(c)).

The ALJ must consider every medical opinion received, (20 C.F.R. §§ 404.1527(c); 416.927(c)), and the ALJ must resolve the conflicts among the various opinions and reject those conclusions if they are inconsistent with the record as a whole. Heino v. Astrue, 578 F.3d 873, 879 (8th Cir. 2009). A treating physician's opinion is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with other substantial evidence in the record; on the other hand, an ALJ need not accept the treating physician's opinion if it does not meet those criteria. Clevenger v. Social Sec. Admin., 567 F.3d 971, 974 (8th Cir. 2009).

"By contrast, '[t]he opinion of a consulting physician who examines a claimant once or not at all does not generally constitute substantial evidence.'" Cunningham v. Apfel, 222 F.3d 496, 502 (8th Cir. 2000) (quoting Kelley v. Cunningham, 133 F.3d 583, 589 (8th Cir. 1998)). However, there are circumstances "in which relying on a non-treating physician's opinion is proper." Vossen v. Astrue, 612 F.3d 1011, 1016 (8th Cir. 2010). When a treating physician's RFC opinion is not substantially supported by the objective evidence, the ALJ may rely on the opinions of consulting physicians when

those opinions are more consistent with the record as a whole.  Casey v. Astrue, 503

F.3d 687, 694 (8th Cir. 2007).

The regulations require the ALJ to give reasons for giving weight to or rejecting

the statements of a treating physician.  Hamilton, 518 F.3d at 610 (citing 20 C.F.R. §

404.1527(d)(2)).  Consequently, whether the ALJ gives great or small weight to the

opinions of treating physicians, the ALJ must give good reasons for giving the opinions

that weight.  Id. (citing Holmstrom v. Massanari, 270 F.3d 715, 720 (8th Cir. 2001)).

"The ALJ may discount or disregard such an opinion if other medical assessments are

supported by superior medical evidence, or if the treating physician has offered

inconsistent opinions."  Id., (quoting Hogan v. Apfel, 239 F.3d 958, 961 (8th Cir. 2001)).

An ALJ may consider opinions from non-examining sources on the nature and

severity of a claimant's impairments, including those opinions from State agency

medical and psychological consultants.  See 20 C.F.R. § 416.927(e)(2)(i).

As discussed above, the ALJ assigned Vang a light work RFC.  The ALJ also

included within the RFC the limitations that Vang was limited to simple, unskilled,

visually demonstrated tasks; she could meet the demands of rapid-paced or high

production goals; she could tolerate no contact with the public; and that she could

tolerate no more than brief and superficial contact with co-workers and supervisors.  Tr.

15.

Vang challenged the ALJ's determination of her RFC on two grounds.  First, she

argued that the RFC did not incorporate Dr. Butler's opinion (which was given great

weight by the ALJ) that Vang had marked limitation to "[r]espond appropriately to usual

work situations and to changes in a work setting."  See Pl.'s Mem., pp. 26-27 (citing Tr.

621).  Vang contended that no treating or examining medical source stated that Vang

could handle normal work situations or changes in a routine setting and therefore, the ALJ's failure to incorporate this limitation constituted a legal error. Id., p. 28.

Second, Vang asserted that her activities of daily living, which she described as doing a little housework or child-caring, do not translate into an ability to perform gainful employment. Id., pp. 38-39.

### 1. Dr. Butler's Opinion that Vang had Marked Limitations In Her Ability To Respond Appropriately to Usual Work Situations and Changes in a Work Setting

Vang's specific complaint as to the RFC assigned by the ALJ was that it did not incorporate Dr. Butler's opinion that Vang had marked limitation to "[r]espond appropriately to usual work situations and to changes in a work setting," (Tr. 621), and that no treating or examining medical source had stated that Vang could handle normal work situations or changes in a routine setting.

This argument has no merit. As a preliminary matter, the Court notes that Dr. Butler's work restrictions made no mention of precluding Vang from being able to respond to usual work situations and or changes in a routine work setting. Tr. 618. To the contrary, Dr. Butler placed the very same work restrictions on Vang as the ALJ did: Vang should be limited to simple and unskilled work that is visually demonstrated; she should have no rapid pace in her work; she should not have any rapid production goals; she should have no public contact; and she should have only brief and superficial contact with co-workers and supervisors. Id.

More significantly, Vang ignored the opinions Dr. Hoistad and Moua, who indicated that Vang had a fair ability (thereby not being precluded) to respond appropriately to changes on a routine work setting; Thersleff's opinion that Vang had a fair ability to respond appropriately to changes on a routine work; and the opinion by

state agency psychologist Dr. Alsdurf (affirmed by Dr. Nelsen) that Vang only have a moderate limitation in being able to respond appropriately to changes in the work setting.  Tr. 354, 469, 642, 664.  These opinions, coupled with Vang's ability to care for her family (with and without her husband) and work for a number of years despite her depression, leads this Court to conclude that the ALJ did not error in not incorporating a limitation that Vang could not handle normal work situation or changes in a routine setting.  The non-exertional RFC propounded by the ALJ is supported by the substantial evidence in the record.

### 2.    Credibility Analysis

In considering a claimant's subjective complaints of disability, the ALJ must assess the claimant's credibility, applying the factors set forth in Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984) (vacated on other grounds by Bowen v. Polaski, 476 U.S. 1167 (1986)).  The Polaski factors require the ALJ to give full consideration to all the evidence presented relating to a claimant's subjective complaints, including prior work record, and observations of third parties and treating and examining physicians relating to such matters as:

1. the claimant's daily activities;

2. the duration, frequency, and intensity of the pain;

3. precipitating and aggravating factors;

4. dosage, effectiveness, and side effects of medication; and

5. functional restrictions.

Id.; see also Cox v. Apfel, 160 F.3d 1203, 1207 (8th Cir. 1998) (same).  "Other relevant factors include the claimant's relevant work history and the absence of objective medical evidence to support the complaints."  Cox, 160 F.3d at 1207.  The ALJ may consider

whether there is a lack of objective medical evidence to support a claimant's subjective complaints, but the ALJ cannot rely solely on that factor in assessing the credibility of Plaintiff's subjective complaints. Ramirez v. Barnhart, 292 F.3d 576, 581 (8th Cir. 2002).

"An ALJ may discount a claimant's subjective complaints of pain only if there are inconsistencies in the record as a whole." Johnson v. Chater, 87 F.3d 1015, 1017 (8th Cir. 1996) (citing Smith v. Shalala, 987 F.2d 1371, 1374 (8th Cir. 1993).) For example, the ALJ may find a claimant's subjective complaints inconsistent with daily activities, lack of treatment, demeanor, and objective medical evidence." Jones v. Chater, 86 F.3d 823, 826 (8th Cir. 1996); see also Cox, 160 F.3d at 1207. If the ALJ rejects a claimant's complaint of pain, "the ALJ must make an express credibility determination detailing his reasons for discrediting the testimony." Cline v. Sullivan, 939 F.2d 560, 565 (8th Cir. 1991).

In performing the credibility analysis, the ALJ examined Vang's daily activities, use of prescription medications, contradictory statements regarding her activities, and her work history. Tr. 17-18. Here, the focus of Vang's argument is that the ALJ improperly assessed her ability to engage in daily activities and her statements about her activities. Pl.'s Mem., pp. 38-99; Pl.'s Reply, pp. 6-7.

As stated previously, on March 15, 2007, Vang reported to Dr. Schuler that she was the primary provider of child care, cooked, did household chores (sweeping, vacuuming, making her bed), handled the grocery shopping, was able to handle finances on her own, watched television, and engaged in activities outside of the home (took walks outside when the weather was nice, visited her family twice a week, visited

her friends once a week and attended the Hmong New Year celebrations and Hmong funerals). Tr. 283.

Three months later, in June 2007, Vang and her husband filled out function reports, as did her daughter in February 2008, that essentially represented that Vang did very little except for going to the doctor, grocery shopping once a month, and attending the Hmong New Year celebration. Tr. 149-56, 160-67, 182-89. The only difference among the reports was that Vang and her husband stated that he did all of the cooking, cleaning and shopping, whereas in February 2008, Vang's daughter said she performed these activities. Id.

In August 2007, Vang told Dr. Barron that her husband prepared the meals, she did no household chores, and had no friends. Tr. 328, 330.

Based on the analysis he had already performed of Vang's activities of daily living at step 3, the ALJ determined that Vang was fairly active, which was inconsistent with her allegations of disability. Tr. 17. Additionally, the ALJ found that Vang made contradictory statements as to what she could do on a daily basis, observing that in March 2007, she told Dr. Schuler that she prepared all of the family's meals, could perform household chores and visited friends weekly, but in August 2007, she stated to Dr. Barron that her husband prepared the meals, she did no household chores, and had no friends. Tr. 17. The ALJ also gave limited weight to the function reports by Vang's husband and her daughter because of their relationship to her and incentive to assist her, and he found that the husband and daughter's statements about who did the cooking contradicted each other. Tr. 18. Further, the ALJ rejected the husband's description of what Vang did not do (and what he did), when for an extended period of

time, Vang was solely responsible for all of the activities he claimed he performed alone. Id.

This Court has already concluded that there is substantial evidence in the record to support the determination that Vang is only moderately impaired in her activities of daily living. See Section V(A)(1), supra. Further, the records are at odds with Vang's assertion that her condition was so debilitating that she could not work fulltime. For example, there is nothing in the records to suggest that between March 2007 and February 2008, Vang had deteriorated from a functioning individual to someone who was virtually unable to do anything. Instead, around this period, her treating physician, Dr. Johnson, found that her condition was improved or that she was in partial remission. Tr. 304, 305, 440, 441, 444. 573. In addition, when Vang and her husband were representing in June 2007 that he was caring for the family, cooking and doing the chores, Dr. Hoistad's treatment notes around this time-frame indicated that Vang was complaining that her husband was not supportive, he was causing issues and stress, he was cheating on her with other another woman, and they had separated and she wanted to divorce. Tr. 397, 398, 399, 406. On December 5, 2007, Vang told Dr. Hoistad that she could not find work or go to school given that she had two small children and her husband had run off. Tr. 392. On January 29, 2008 Vang reported that she did cook for her children, although she forgot to do so at times. Tr. 388. Id.

At the hearing before the ALJ, Vang testified that she had separated from her husband in 2007. Tr. 27. She had nine children, five of which still with her. Id. Vang was the primary caretaker of the three-year old and was alone at home with this child. Tr. 27, 33. Vang testified that she was able to drive and drove her daughters to the Laundromat or the grocery store. Tr. 28, 32.

Vang is correct that daily activities, standing alone, do not disprove the existence of a disability, nonetheless, they are an important factor to consider in the evaluation of subjective complaints. See Wilson v. Chater, 76 F.3d 238, 241 (8th Cir. 1996). In this case, for the reasons described above, the Court finds no error in the ALJ's examination and assessment of the inconsistencies and contradictions in the record regarding Vang's daily activities. But more importantly, it is important to remember that the ALJ did not rest the credibility analysis solely on Vang's inconsistent statements of daily activities. Rather, he also relied on the other factors that bear on the credibility analysis, including her noncompliance with taking her medications and the fact that she left her work due to factors unrelated to her conditions. Tr. 17. See Allen v. Astrue, No. 07-6078-SSA-CV-SJ-WAK, 2008 WL 2838113, at *3 (W.D. Mo. July 21, 2008) (record did not reveal substantial changes in physical and mental conditions between date claimant stopped working and date of alleged onset of disability).

In sum, the Court finds based on substantial evidence in the record that the ALJ gave good reasons for not fully crediting Vang's testimony regarding the severity of her mental complaints.

## VI. CONCLUSION

For the reasons discussed above, the Court concludes that substantial evidence in the record supports the ALJ's determination that Vang did not meet or equal Listing 12.04. Substantial evidence in the record also supports the ALJ's weighing of the medical opinions, his credibility analysis, and ultimately, his RFC determination. Finally, the vocational expert's testimony that Vang can perform her past employment constitutes substantial evidence to support the ALJ's determination that Vang is not disabled within the meaning of the Social Security Act.

**VI.    RECOMMENDATION**

For the reasons set forth above,

IT IS RECOMMENDED THAT:

1.    Plaintiff's Motion for Summary Judgment [Docket No. 9] be **DENIED**; and

2.    Defendant's Motion for Summary Judgment [Docket No. 12] be

**GRANTED.**

Dated:        February 11, 2013

*s/ Janie S. Mayeron*
JANIE S. MAYERON
United States Magistrate Judge

Under D.Minn. LR 72.2(b) any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by **February 25, 2013**, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections.   A party may respond to the objecting party's brief within ten days after service thereof.   All briefs filed under this Rules shall be limited to 3500 words.   A judge shall make a de novo determination of those portions to which objection is made.   This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable directly to the Circuit Court of Appeals.